The PENNSYLVANIA MEDICAL SOCIETY, on behalf of itself and all of its Members, and Peter M. Daloni, MD, Karen A. Rizzo, MD and Martin D. Trichtinger, MD, Petitioners

v.

The DEPARTMENT OF PUBLIC WELFARE of the Commonwealth of Pennsylvania and Office of the Budget of the Commonwealth of Pennsylvania, Respondents.

The Hospital & Healthsystem Association of Pennsylvania, Geisinger Health System, St. Vincent Health Center and Abington Memorial Hospital, Petitioners

v.

The Department of Public Welfare of the Commonwealth of Pennsylvania, Office of the Budget of the Commonwealth of Pennsylvania, Respondents.

Commonwealth Court of Pennsylvania.

Argued Feb. 10, 2010.

Decided April 15, 2010.

Kevin J. McKeon, Harrisburg, and David E. Loder, Philadelphia, for petitioners.

Daniel Segal and Dylan J. Steinberg, Philadelphia, for respondents.

BEFORE: PELLEGRINI, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, McCULLOUGH, Judge, and BUTLER, Judge.

OPINION BY Judge BUTLER.

The Pennsylvania Medical Society, on behalf of itself and all of its members; and Peter M. Daloni, M.D., Karen A. Rizzo, M.D. and Martin D. Trichtinger, M.D.; and the Hospital & Healthsystem Association of Pennsylvania, Geisinger Health System, St. Vincent Health Center and Abington Memorial Hospital (Petitioners) filed an application for summary relief based on the Court's July 24, 2009 en banc opinion disposing of preliminary objections filed by the Department of Public Welfare (DPW) and the Office of the Budget of the Commonwealth of Pennsylvania (collectively, the Commonwealth). For the reasons that follow, we grant Petitioners' application for summary relief.

Under Section 711(d) of the Medical Care Availability and Reduction of Error (MCARE) Act,[1] health care providers are, with certain exceptions, required to maintain minimum medical professional liability coverage. In addition, Section 712 of the MCARE Act[2] establishes a medical professional liability fund commonly known as the MCARE Fund. The MCARE Fund is used to pay claims against providers for losses or damages awarded in medical professional liability actions in excess of their basic insurance coverage. The MCARE Fund is funded by an "assessment" on each participating health care provider. The amount of the assessment is determined by the provider's prior claim history and private medical malpractice insurance premiums. Accordingly, Pennsylvania health care providers are required to maintain private professional liability insurance *and* to contribute to the MCARE Fund.

In 2003, the General Assembly enacted the Health Care Provider Retention (HCPR) Program[3] (Abatement Law) to alleviate the threat that many physicians would leave Pennsylvania if the exorbitant cost of professional liability insurance was not addressed. The Abatement Law served to provide abatements to physicians and other participating MCARE providers (excluding hospitals), thereby reducing their annual MCARE assessments. The Abatement Law provided eligible physicians in high risk practices 100% abatement of their annual assessment, and other

---

1. Act of March 20, 2002, P.L. 154, *as amended*, 40 P.S. § 1303.711(d).

2. 40 P.S. § 1303.712.

3. Originally enacted as Act of December 23, 2003, P.L. 237, formerly 62 P.S. §§ 443.7 and 1301–A—1310–A, repealed and reenacted as an amendment to the MCARE Act by the Act of December 22, 2005, P.L. 458, 40 P.S. §§ 1303.1101–1115. Citations herein are made to the provisions of the Abatement Law as reenacted in the MCARE Act, subsequently repealed by Act of October 9, 2009, P.L. 537.

eligible health care providers 50% of their annual MCARE assessment. When originally enacted, the Abatement Law was limited to the 2003–2004 MCARE assessments. Subsequent legislation, however, extended the abatement program to the 2005, 2006, and 2007 MCARE assessments.[4]

In order to fund the abatement program and reduce providers' MCARE Fund assessments, the General Assembly established a special account known as the HCPR Account, from which the abatements were to be paid. Section 1112(a) of the Abatement Law[5] provides:

> (a) Fund established. There is established within the General Fund a special account to be known as the [HCPR] Account. Funds in the account shall be subject to an annual appropriation by the General Assembly to [DPW]. [DPW] shall administer funds appropriated under this section consistent with its duties under section 201(1) of … the Public Welfare Code.[6]

DPW was the administrator of these funds because it could, it was thought, receive matching federal Medical Assistance funds. According to Section 201(1) of the Public Welfare Code, DPW has the power and the duty to apply for, receive and use such federal funds "for the financing in whole or in part of programs in fields in which the department has responsibility." It is undisputed that, in 2004, 2005, 2006 and 2007, the General Assembly appropri-

ated to DPW a total of $737 million for health care provider retention.

The General Assembly raised funds to pay for the abatements by increasing the tax on cigarettes by 25 cents per pack (18.52% of the cigarette tax). Section 1211 of the Cigarette Tax Law,[7] required that a portion of the tax collected be deposited into the HCPR Account:

> There is established in the General Fund a special account to be known as the [HCPR] Account. Eighteen and fifty-two hundredths per cent of the proceeds of the tax imposed by section 1206 shall be deposited in the account. Funds in the account shall be subject to an annual appropriation and shall be administered as provided by law.

In addition, motor vehicle violation surcharge revenue was available, pursuant to Section 712(m) of the MCARE Act to help fund the program. *See* Section 6506 of the Vehicle Code, 75 Pa.C.S. § 6506.

In 2004, the Budget Secretary was appointed to make transfers from the HCPR Account to the MCARE Fund, and to determine the amount of such transfers up to a specified limit. Specifically, Section 1112(c) of the Abatement Law[8] provides: "The Secretary of the Budget may annually transfer from the [HCPR] account to the [MCARE] Fund an amount up to the aggregate amount of abatements granted by the Insurance Department under section 1104(b)."

It is undisputed that the Commonwealth has granted physicians and other partici-

---

**4.** Section 4 of the Act of November 29, 2004, P.L. 1272, *formerly* 62 P.S. § 1301–A and 1302–A (extending program to 2005); Section 2 of the Act of December 22, 2005, P.L. 458, *formerly* 40 P.S. § 1303–1102 (extending program to 2006); Section 2 of the Act of October 27, 2006, P.L. 1198, 40 P.S. § 1303–1102 (extending program to 2007).

**5.** 40 P.S. § 1303.1112(a).

**6.** Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. § 201(1).

**7.** Act of March 4, 1971, P.L. 6, *as amended*, added by the Act of December 23, 2003, P.L. 250, 72 P.S. § 8211, subsequently repealed by Act of October 9, 2009, P.L. 537.

**8.** 40 P.S. § 1303.1112(c).

pating health care providers abatements from their 2003–2007 MCARE assessments in the amount of $946 million as follows:

| Calendar Year | Value of Abatements |
| --- | --- |
| 2003 | $203,000,000 |
| 2004 | $245,000,000 |
| 2005 | $208,000,000 |
| 2006 | $158,000,000 |
| 2007 | $132,000,000 |

Pet. for Rev. ¶ 19. It is also undisputed that, in 2004, $100 million was transferred from the HCPR Account to the MCARE Fund. In 2005, an additional $230 million was transferred. Thus, the Commonwealth has transferred $330 million from the HCPR Account to the MCARE Fund. Although abatements continued to be granted, and revenues to fund the awarded abatements continued to accumulate in the HCPR, no funds were transferred to the MCARE Fund after 2005. From 2004 through 2007, approximately $170 million of motor vehicle violation surcharge revenue was deposited into the MCARE Fund. The HCPR Account, as of July 31, 2009, had only approximately $723 million in it. It is unclear, according to Petitioners, how much of the motor vehicle violation surcharge revenue deposited into the MCARE Fund was available and used to fund abatements. Petitioners' claim, based upon these facts, that at least $446 million (if all of the motor vehicle surcharge violation revenue was available) and possibly as much as $616 million (if none of the motor vehicle surcharge violation revenue was available) was deposited into the HCPR Account for abatements, but was not transferred to the MCARE Fund.[9] The Commonwealth, on the other hand, has stated that, to the extent that it was required to fund the MCARE Fund, the Budget Secretary made transfers sufficient to allow the MCARE Fund to meet its statutory claims and expenses (the transfer in 2005 being the last one necessary), and that there was no requirement that dollar-for-dollar transfers be made in the total amounts of abatements granted.

On December 11, 2008, Petitioners filed petitions for review in this Court's original jurisdiction in the nature of a complaint for declaratory judgment seeking a declaration that the Commonwealth is required to fully fund the HCPR and to transfer those funds to MCARE under the applicable abatement statutes, and that the Commonwealth's failure to do so was a violation of the Uniformity Clause of the Pennsylvania Constitution.[10] The petitions for review also sought injunctive relief against the Commonwealth, ordering that it refrain from using funds dedicated for abatement for any other purpose, and provide an accounting of the MCARE Fund and HCPR Account since 2004.[11]

9. The precise amount may be determined by an accounting of the MCARE Fund and HCPR Account since 2004.

10. Separate petitions were filed by the Pennsylvania Medical Society on behalf of itself and all of its Members, and Peter M. Daloni, M.D., Karen A. Rizzo, M.D., and Martin D. Trichtinger, M.D., at 584 M.D. 2008, and the Hospital & Healthsystem Association of Pennsylvania, Geisinger Health System, St. Vincent Health Center and Abington Memorial Hospital at 585 M.D. 2008. On January 14, 2009, these cases were consolidated.

11. On September 14, 2009, Petitioners also filed an application for special relief in the nature of a preliminary injunction on the basis that the then-ongoing budget negotiations might result in a depletion of the funds in question. After a hearing on September 17, 2009, this Court denied the preliminary injunction on the basis that the action was premature, and the courts may not interfere with the legislative process. In reaction to the enactment of budget legislation signed into law on October 9, 2009, on October 13, 2009, Petitioners renewed their application for special relief in the nature of a preliminary injunction which, after argument, was

On January 12, 2009, the Commonwealth filed preliminary objections asserting that Petitioners' claims failed as a matter of law because: (1) DPW's obligation to administer and fund MCARE abatements was contingent upon its success in securing matching federal funding, which it was ultimately unable to do; (2) the Budget Secretary's authority to transfer funds is discretionary and not mandatory; (3) the Budget Secretary's authority to make annual transfers expired December 31, 2008, by operation of law; and, (4) assessments levied under the MCARE Act are akin to insurance premiums and are not taxes.

As stated above, this Court, sitting en banc, issued an unreported memorandum opinion on July 24, 2009, sustaining the Commonwealth's preliminary objections as to the Uniformity Clause, but overruling the Commonwealth's preliminary objections as to the Commonwealth's duty and its failure to fund the subject accounts. On September 9, 2009, Petitioners filed this application for summary relief, stating that this Court ruled on the merits of Petitioners' claims in its July 24, 2009 opinion, when it held that the Commonwealth had a mandatory statutory duty to transfer sufficient funds from the HCPR Account to fully fund the MCARE Fund abatements; and stating that since the facts are not in dispute, Petitioners are entitled to judgment in their favor as a matter of law.

Petitioners aver that this Court ruled on the merits of Petitioners' claims in its July 24, 2009 opinion, when it held that the Commonwealth had a mandatory statutory duty to transfer sufficient funds from the HCPR Account to fully fund the MCARE Fund abatements. We disagree with Petitioners' contention, in light of the fact that the July 24, 2009 opinion examined a different question than what has been presented by the instant application. The opinion issued by this Court on July 24, 2009 considered and disposed of the Commonwealth's preliminary objections in the nature of a demurrer, which merely tested the legal sufficiency of the complaint. The Court held that Petitioners' pleadings were legally sufficient to allow the case to continue. The merits of the case, however, were not conclusively ruled upon at that time. The Honorable Bernard J. McGinley made this clear in his October 19, 2009 order denying Petitioners' re-application for special relief in the nature of a preliminary injunction when he stated that, in overruling most of the Commonwealth's preliminary objections on July 24, 2009, the Court was "leaving open the underlying question whether [the Commonwealth has] the legal duty to use the HCPR Account funds to fully fund previously granted abatements." McGinley, J., Order dated October 19, 2009, ¶ 4. The Court will now proceed to close that question.

Currently before this Court is an application for summary relief. In ruling on an application for summary relief we must "view the evidence of record in the light most favorable to the non-moving party and enter judgment only if there are no genuine issues as to any material facts and the right to judgment is clear as a matter of law." *McSpadden v. Dep't of Corrs.*, 886 A.2d 321, 325 (Pa.Cmwlth.2005). "The moving party has the burden of proving that there is no genuine issue of material

---

denied by this Court on October 19, 2009 on the basis that Petitioners failed to demonstrate that they would suffer immediate and irreparable harm, or that the requested injunction would not adversely affect the public interest. The Commonwealth states that Peti-

tioners filed a third application for special relief; however, there is no indication on the Court's docket that the filing occurred. There is a notation on the docket that a hearing on an application for special relief was cancelled when Petitioners withdrew their application.

fact." *Bigansky v. Thomas Jefferson Univ. Hosp.*, 442 Pa.Super. 69, 658 A.2d 423, 425 (1995). "A material fact is one that directly affects the outcome of the case." *Kuney v. Benjamin Franklin Clinic*, 751 A.2d 662, 664 (Pa.Super.2000) (citing *Stevens Painton Corp. v. First State Ins. Co.*, 746 A.2d 649, 653 (Pa.Super.2000)).

Petitioners first argue that the facts claimed by the Commonwealth as necessary to establish Petitioners' claims are not in dispute, are immaterial or are not factual at all, and the fact that there are outstanding discovery requests does not preclude summary relief. Specifically, Petitioners aver that "the Pennsylvania Insurance Department has credited the abatements, without receipt of HCPR Account funds, against funds already in the MCARE Fund, thereby improperly paying the assessment abatements with MCARE funds supplied in part by Petitioners, rather than with funds transferred from the HCPR Account." PA Med. Society Pet. for Rev., ¶ 61; *see also* Hospital & Health-system Assoc. Pet. for Rev., ¶ 5. The Commonwealth argues that, in establishing the HCPR program, the General Assembly "did not link the HCPR Account directly, much less exclusively, to the Abatement Program," and that the appropriations made to the MCARE Fund need not be, and were not, related to the abatements previously granted. Comm. Answer and New Matter to PA Med. Society Pet. for Rev., ¶¶ 153, 155, 157. We agree with Petitioners.

■ The factors that directly affect the outcome of this case relate to: (1) whether the Commonwealth had a duty to make transfers from the HCPR Account to the MCARE Fund in the amount necessary to fully fund the abatements to providers in 2003–2007 under the HCPR program, and (2) whether the Commonwealth failed to make transfers from the HCPR Account to the MCARE Fund to fully fund the abatements awarded to providers in 2003–2007 under the HCPR program. The former question is a matter of statutory interpretation. In its July 24, 2009 en banc opinion, this Court stated:

> When Section 1112 is read in conjunction with the rest of the HCPR statute, including its title, and the description of the purpose and funding mechanisms for the HCPR program, to give the Budget Secretary complete unfettered discretion to decide whether to fund the MCARE Fund, regardless of the need for the funds, is obviously inconsistent with the statutory scheme. It certainly appears that the General Assembly has mandated that the HCPR Account pay for the abatements.

*The Pennsylvania Med. Soc'y v. Dep't of Pub. Welfare* (Pa.Cmwlth. Nos. 584, 585 M.D.2008, filed July 24, 2009) (*The Pennsylvania Med. Soc'y*), slip op. at 14. On the same reasoning, we now hold, as a matter of law and of statutory interpretation, that the Commonwealth had a duty to make transfers from the HCPR Account to the MCARE Fund in the amount necessary for abatements to be paid by the Fund, and not by providers.

Thus, the only remaining issue is whether there are any genuine issues of material fact which prevent establishing whether the Commonwealth failed to make transfers from the HCPR Account to the MCARE Fund to fully fund the abatements awarded to providers in 2003–2007. On that point, it is undisputed that, in 2004, $100 million was transferred from the HCPR Account to the MCARE Fund. In 2005, $230 million was transferred. Thus, the Commonwealth has transferred $330 million from the HCPR Account to the MCARE Fund. Comm. Answer and New Matter to PA Med. Society Pet. for

Rev., ¶ 25; Stip. of Facts, filed October 15, 2009, ¶ 9. The Commonwealth has also admitted that, although abatements continued to be granted, and revenues to fund the awarded abatements continued to accumulate in the HCPR, none of those funds were transferred to the MCARE Fund after 2005. Comm. Answer and New Matter to PA Med. Society Pet. for Rev., ¶ 117.

The Commonwealth argues that transfers from the HCPR Account to the MCARE Fund were not necessary after 2005 since the MCARE Fund "has been able to fulfill its current obligations to pay claims and expenses" without further transfers from the HCPR Account. Comm. Br. at 36, citing Adams Decl. ¶¶ 4–5; Comm. Answer and New Matter to PA Med. Society Pet. for Rev., ¶ 117. There is no dispute that the MCARE Fund has had the ability to pay its bills. The question before us, however, is not whether it can pay *current* claims, but whether the Commonwealth failed to make transfers from the HCPR Account to the MCARE Fund to fully fund the abatements awarded to providers in 2003–2007. This is an issue of fact, as to which the underlying material facts remain undisputed.[12]

The Commonwealth claims that there are numerous additional material facts in dispute in this litigation, and there is outstanding discovery, such that the Court cannot be assured there is no genuine issue of material fact. *See* Commonwealth Br. in Opp. to Petitioners' Application for Summary Relief, App. A. It is clear, however, that those facts "in dispute" do not directly affect the outcome of this case. On the contrary, the undisputed facts and admissions of record reflect that the Com-

---

**12.** The Commonwealth's position is that the MCARE Fund can meet its *current* obligations without the transfer of funds. That does not present a genuine issue of material fact in this case. The Commonwealth's position notwithstanding, the Commonwealth did not address the MCARE Fund's *prospective* ability to meet its obligations until the time of its termination. Since prospective obligations of the MCARE Fund are in jeopardy due to the Commonwealth's failure to fully fund it, we will address that issue here.

The MCARE Fund consists of monies from the Medical Professional Liability Catastrophe Loss Fund (CAT Fund) (40 P.S. § 1303.712(b)); provider assessments (40 P.S. §§ 1303.712(d), 1303.712(*l*)); abatements funded by taxpayers in the form of motor vehicle violation surcharges and monies in the HCPR Account from cigarette taxes (40 P.S. §§ 1303.712(m), 1303.1112(c); Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. § 8211, added by the Act of December 23, 2003, P.L. 250; and, 75 Pa.C.S. § 6506); and investments (40 P.S. § 1303.712(*l*)). The monies in the MCARE Fund must be used to pay claims against medical care providers for damages awarded in medical professional liability cases in excess of their basic insurance coverage (and CAT Fund cases), and costs of administration of the MCARE Fund (40 P.S. § 1303.712(a)). The MCARE Fund is managed on a "pay-as-you-go" basis. It does not collect and maintain reserves, so the annual assessment merely collects funds needed to cover claims and expenses for the assessment year. However, claims are being made on an ongoing basis that must be paid into the future by the MCARE Fund until it has satisfied all of its liabilities. Thus, the MCARE Fund has unfunded liabilities. It must project what monies will be necessary to pay for claims reported but not yet paid, and for those incurred but not yet reported. Since the abatements were not fully funded between 2003 and 2007, the MCARE Fund has less money available to meet its future obligations and must, under the current statutory scheme, over time, increase provider assessments in order to meet them. Providers in the future, therefore, will pay increased assessments, meaning that any abatements they have received were actually only mere payment deferrals, rather than abatements. When the MCARE Fund has satisfied all of its liabilities, it will terminate (40 P.S. § 1303.712(k)). It has been statutorily mandated that monies remaining in the fund at that time, if any, will then be returned to providers (40 P.S. § 1303.712(k)).

monwealth had a duty to fully fund the MCARE Fund with monies from the HCPR, but failed to do so. We hold, therefore, that there are no genuine issues of material fact.[13]

■ Petitioners further argue that based on the record, they are entitled to judgment as a matter of law. The Commonwealth, however, contends that Petitioners have no clear right to relief since Petitioners lack standing to bring this action; Petitioners' reading of the pre–2009 statutory scheme is fundamentally flawed; there is a far more reasonable reading of the statute than that presented by Petitioners; there is no support for Petitioners' claim that the Commonwealth was required to make a dollar-for-dollar transfer in the amounts of the abatements; DPW was not required and has no authority to transfer money to the MCARE Fund to pay for abatements; and the recently-enacted budget legislation contradicts Petitioners' claims, and makes the relief they seek unavailable to them.

The Commonwealth incorrectly argues that Petitioners do not have standing to bring this action. This Court has held:

It is well settled that an association, as a representative of its members, may have standing to bring a cause of action even in the absence of injury to itself. In order to have standing, the association must allege that at least one of its members is suffering immediate or threatened injury as a result of the challenged action. Moreover, the member of that association who is threatened with inju-

ry must have an interest in the litigation that is substantial, direct and immediate. . . . [A]n interest is 'substantial' when there is a discernable adverse effect to an interest of the aggrieved individual which differs from the abstract interest of the general citizenry in having others comply with the law. An interest is 'direct' when an aggrieved person can show a causal connection between the alleged harm to his or her interest and the matter of which he or she complains. Finally, the interest is 'immediate' when the causal connection between the injury and the matter complained of is not too remote.

*Pennsylvania Sch. Bds. Ass'n, Inc. v. Commonwealth Ass'n of Sch. Adm'rs, Teamsters Local 502,* 696 A.2d 859, 868–69 (Pa.Cmwlth.1997) (citations omitted). Petitioner, Pennsylvania Medical Society, has specifically averred that members, Drs. Daloni, Rizzo and Trichtinger, have suffered harm in that they received abatements of only 50% of their assessment amounts between 2003 and 2007. PA Med. Society Pet. for Rev., ¶¶ 2–6. It is clear that the interest alleged to have adversely affected these medical care providers differs from that of the general citizenry. In addition, there is a causal connection between the failure of the Commonwealth to fully fund the MCARE Fund and the harm claimed to have been suffered by these individuals. Finally, the causal connection between the Commonwealth's failure to fulfill its duty is not too remote for purposes of

---

**13.** While Petitioners may be unable at this time, without an accounting of the funds in question, to determine the exact amount that must be forthcoming by the Commonwealth to correct its actions, that is not a basis upon which this Court should deny summary relief. *See Landau v. W. Pennsylvania Nat'l Bank,* 445 Pa. 217, 282 A.2d 335 (1971) (summary judgment granted notwithstanding changing amount of debt owed on a mortgage, where accounting could be provided when the property was sold). Moreover, since the crux of this case involves a purely legal issue, the fact that the Commonwealth wishes to proceed with discovery is not a basis on which this Court should deny summary relief. *See Meier v. Maleski,* 670 A.2d 755 (Pa.Cmwlth.1996), *aff'd,* 549 Pa. 171, 700 A.2d 1262 (1997).

standing. Therefore, Petitioners' interests, which are allegedly harmed as a result of the Commonwealth's failure to fully fund the MCARE Fund, is sufficiently substantial, direct and immediate to warrant the conclusion that Petitioners have standing.

As to whether Petitioners' reading of the applicable pre–2009 statutory scheme is flawed, whether there is a more reasonable reading of the statute than that presented by Petitioners, whether there is support for Petitioners' claim that the Commonwealth was required to make a dollar-for-dollar transfer in the amounts of the abatements, or whether DPW was required and has authority to transfer money to the MCARE Fund to pay for abatements, this Court, as indicated, finds the reasoning of the July 24, 2009 en banc opinion overruling the Commonwealth's preliminary objections highly instructive in addressing those precise issues. As such, we restate the Court's reasoning and analysis as applicable here. In that opinion, this Court stated:

> Section 1112(a) of the Abatement Law, 40 P.S. § 1303.1112(a), requires that DPW shall administer funds appropriated consistent with its duties under section 201(1) of Public Welfare Code. [The Commonwealth] contend[s] Section 201(1) of the Public Welfare Code provides that DPW shall have the following limited power and duties: 'With the approval of the Governor, *to act as the sole agency of the State when applying for, receiving and using Federal funds* for the financing in whole or in part of programs in fields in which the department has responsibility.' 62 P.S. § 201(1) (Emphasis added).
>
> This Court does not agree with [the Commonwealth] that the General Assembly's reference in Section 1112(a) of the Abatement Law to Section 201 of

the Public Welfare Code was necessarily intended to place a condition precedent on the transfer of funds. Section 201 of the Public Welfare Code, titled 'State participation in cooperative federal programs' lists powers and duties of the DPW and subsection (1) merely established DPW as the single department responsible for the application and receipt of federal matching funds. Section 201(1) of the Public Welfare Code provides no limitation on DPW's authority to transfer funds in the absence of federal funding, but only states, as is required by federal law, that if the Commonwealth decides to apply for and use federal funds for programs administered by DPW, the DPW is the only State agency that may do so.

[The Commonwealth's] position that the DPW may not act unless it receives federal funds has no basis in statute, and is, in fact, contrary to the plain meaning of the statute. . . .

Next, [the Commonwealth] assert[s] . . . the Abatement Law does not *require* the Budget Secretary to transfer funds from the HCPR Account to the MCARE Fund. They contend the Budget Secretary's authority is discretionary. This raises an issue of statutory construction and legislative intent.

The object of statutory construction is to ascertain and effectuate the intention of the General Assembly. When the language of the statute is clear, that language is dispositive of legislative intent and so vitiates the need for further interpretation. Importantly, the plain language reading of a statute requires that 'sections of a statute must be construed with reference to the entire statute and not apart from their content.'

Here, [the Commonwealth] rel[ies] on Section 1112(c) of the Abatement Law which states that 'the Secretary of the

Budget *may* annually transfer from the account to the [MCARE] Fund an amount up to the aggregate amount of abatements granted by the Insurance Department under section 1104(b).' (Emphasis added). The language of this section appears to give the Budget Secretary discretion to transfer funds from the HCPR Account to the MCARE Fund. However, as its name suggests, the HCPR Program was established to retain health care providers in Pennsylvania by reducing the burden of paying professional liability insurance premiums under the MCARE program. The General Assembly established mandatory abatements, a mandatory account from which to fund the abatements and two mandatory funding sources for the abatements.[14]

When Section 1112 is read in conjunction with the rest of the HCPR statute, including its title, and the description of the purpose and funding mechanisms for the HCPR program, to give the Budget Secretary complete unfettered discretion to decide whether to fund the MCARE Fund, regardless of the need for the funds, is obviously inconsistent with the statutory scheme. It certainly appears that the General Assembly has mandated that the HCPR Account pay for the abatements. As Petitioners point out, there is no provision for the [Insurance Department] to refuse to award abatements or decline to notify DPW when abatements are awarded. In addition, the General Assembly has taken measures to assure that the abatements are

paid by the Fund, not providers. If a provider has already paid the assessment prior to the award of the abatement the General Assembly has directed in Section 1110 of the Abatement Law that '[t]he Insurance Department *shall* either issue refunds or credits for monies due health care providers under this chapter.[']

*The Pennsylvania Med. Soc'y*, slip op. at 11–14 (citations and footnote omitted). Thus, this Court's prior opinion sufficiently addresses the Commonwealth's arguments.

█ Finally, the Commonwealth argues that, regardless of Petitioners' prior entitlement, the budget legislation passed at the end of 2009, by eliminating the HCPR program and the HCPR Account, abolished Petitioners' right to relief, and that a declaration by this Court on these issues will "prove to be purely academic" and "nothing more than advisory opinions." Comm. Br. at 35. We disagree. Section 1976(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1976(a), specifically provides that:

(a) The repeal of any civil provisions of a statute shall not affect or impair any act done, or right existing or accrued, or affect any civil action pending to enforce any right under the authority of the statute repealed. Such action may be proceeded with and concluded under the statutes in existence when such action was instituted, notwithstanding the repeal of such statutes, or such action may be proceeded with and concluded under the provisions of the new statute, if any, enacted.

14.
Again, the General Assembly increased the cigarette tax and directed that twenty-five cents per pack be deposited in the HCPR Account. In Section 1112(a), the General Assembly stated that 'the funds in the account *shall* be subject to an annual appropriation by the General Assembly to the

Department of Public Welfare.' Section 1104(b) of the Abatement Law provides [i]f a provider meets the requirements of the program, the Insurance Department '*shall* ... grant the applicable abatement of the assessment' and '*shall* notify the Department of Public Welfare' of the abatement.

Moreover, this Court addressed this issue in its July 24, 2009 opinion, albeit in terms of the expiration of the abatement program, but the reasoning of this Court is equally applicable to the repeal by virtue of the 2009 budget legislation. The Court explained:

> Contrary to [the Commonwealth's] position, the end of the HCPR Program only means that the Insurance Department will no longer grant abatements to eligible health care providers. It does not mean that DPW and Budget Secretary may avoid their statutory responsibilities to fund the program from the specifically designated HCPR Account while the program was in effect. If indeed it is determined that the funds were inappropriately withheld, then it is entirely proper and consistent with the Abatement Law to direct the [Commonwealth] to transfer the appropriated funds to the MCARE Fund.

*The Pennsylvania Med. Soc'y,* slip op. at 15 (citation omitted).

 Granted, in the absence of a constitutional bar, the General Assembly is free to repeal and amend previous legislation. *City of Phila. v. Schweiker,* 817 A.2d 1217 (Pa.Cmwlth.2003), *aff'd,* 579 Pa. 591, 858 A.2d 75 (2004). However, Article 1, Section 11 of the Pennsylvania Constitution provides that:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

Pa. Const. art. I, § 11. Accordingly, "[a] statute [or statutory repeal] is normally construed to operate prospectively[, and] shall [not] be retroactive unless clearly and manifestly so intended by the General Assembly." *Borough of Jefferson Hills v. Jefferson Hills Police Dep't Wage & Policy Comm.,* 904 A.2d 61, 64–65 (Pa.Cmwlth. 2006) (citations omitted). Pennsylvania law specifically protects vested interests from being extinguished by subsequent legislation. *Krenzelak v. Krenzelak,* 503 Pa. 373, 469 A.2d 987 (1983). A vested right is "[a] right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent." *Black's Law Dictionary* 1438 (9th ed. 2009); *In the Interest of K.A.P., Jr.,* 916 A.2d 1152 (Pa.Super.2007), *aff'd,* 596 Pa. 351, 943 A.2d 262 (2008). Rights are only vested when they are fixed and without condition. *Sher v. Berks County Bd. of Assessment Appeals,* 940 A.2d 629 (Pa.Cmwlth.2008). Moreover, vested rights "must be something more than a mere expectation, based upon an anticipated continuance of existing law. It must have become a title, legal or equitable, to the present or future enforcement of a demand, or a legal exemption from a demand made by another." *Konidaris v. Portnoff Law Assocs., Ltd.,* 598 Pa. 55, 74, 953 A.2d 1231, 1242 (2008) (citing *Lewis v. Pennsylvania R. Co.,* 220 Pa. 317, 324, 69 A. 821, 823 (1908)).

In this case it is clear that doctors have to pay the assessment, or they cannot practice in the Commonwealth. According to Section 1102(a) of the Abatement Law,[15] "[t]he program **shall** provide assistance in the form of assessment abatements to health care providers for calendar years 2003, 2004, 2005, 2006 and 2007 . . . ." for those health care providers not deemed ineligible, who timely submit applications to the Insurance Department. (Emphasis

---

15. 40 P.S. § 1303.1102(a).

added). Section 1104(b) of the Abatement Law [16] provides that:

> Upon receipt of a completed application, the Insurance Department **shall review** the applicant's information *and* **grant** the applicable abatement of the assessment for the previous calendar year specified on the application in accordance with all of the following:
>
> (1) The Insurance Department shall notify the Department of Public Welfare that the applicant has self-certified as eligible for a 100% abatement of the imposed assessment if the health care provider was assessed under section 712(d)....
>
> (2) The Insurance Department shall notify the Department of Public Welfare that the applicant has self-certified as eligible for a 50% abatement of the imposed assessment if the health care provider was assessed under section 712(d)....

(Emphasis added).

If a provider pays his assessment for the calendar year prior to applying for abatement, Section 1104(c) of the Abatement Law [17] also provides that:

> [T]he health care provider may, in addition to the completed application required by subsection (a), submit a request for a refund.... If the Insurance Department grants the health care provider an abatement of the assessment for the calendar year in accordance with subsection (b), the Insurance Department shall either refund to the health care provider the portion of the assessment which was abated or issue a credit to the health care provider's professional liability insurer.

The absence of Insurance Department discretion to deny abatements properly applied for, read together with this Court's conclusion that in enacting the HCPR program, the General Assembly established mandatory abatements, a mandatory account from which to fund those abatements and two mandatory funding sources for the abatements, makes it clear that qualified health care providers' rights to the abatements are fixed and without condition. Thus, they are more than mere expectations, and rise to the level of a legal or equitable title, subject to the present or future enforcement of a demand. Moreover, "[f]or purposes of Article 1, Section 11 ... it is enough to say that the moment a cognizable legal injury is befallen a potential plaintiff, whatever that injury may be, a cause of action has 'accrued' and cannot be subsequently eliminated or altered by retroactive act of the legislature." *Konidaris*, 598 Pa. at 66, 953 A.2d at 1237. We hold, therefore, that the abatements are vested rights that cannot be extinguished by the October 2009 budget legislation.

Based on the foregoing, viewing the record in a light most favorable to the Commonwealth, it is clear that Petitioners are entitled to judgment in their favor as a matter of law. Since the Petitioners have established that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law, their application for summary relief is granted.

President Judge LEADBETTER and Judge BROBSON did not participate in the decision in this case.

## ORDER

AND NOW, this 15th day of April, 2010, Petitioners' application for summary relief is granted.

---

16. 40 P.S. § 1303.1104(b).

17. 40 P.S. § 1303.1104(c).

DISSENTING OPINION BY Judge PELLEGRINI.

In granting summary relief, the majority directs that $800 million from the General Fund be transferred to the MCARE Fund. Because the abatements have been paid and doctors have received everything "promised," the net result of the majority decision is an $800 million personal windfall to doctors, with the consequential effect of making 2009–2010 budget out of balance. Accordingly, I respectfully dissent.

## I.

Under the Medical Care Availability and Reduction of Error (MCARE) Act,[1] physicians, hospitals, and health care providers in the Commonwealth are required to maintain minimum medical liability coverage. Providers must also contribute to the MCARE Fund, which provides a secondary layer of coverage used to pay claims against doctors for malpractice awards in excess of doctors' basic insurance coverage.[2] The MCARE Fund is funded by annual assessments levied against doctors, the amount of which is determined based upon each doctor's prior claim history and private medical malpractice insurance premiums.[3]

Due to the high costs of medical malpractice coverage in the Commonwealth and the perception that physicians would purportedly leave Pennsylvania if something was not done to alleviate these costs, the General Assembly enacted the Health Care Provider Retention (HCPR) Program (Abatement Law) in 2003.[4] This law provided subsidies to participating MCARE providers to reduce the amount of their annual assessments to the MCARE Fund for their medical malpractice insurance.[5]

The subsidies were funded by increases in certain taxes. First, the tax on cigarettes was raised by 25 cents per pack.[6] Second, motor vehicle violation surcharge revenue was also to be made available to help fund the Abatement Law, if necessary. See Section 6506 of the Vehicle Code, 75 Pa.C.S. § 6506.

Under Section 1112(a) of the Abatement Law, the funds were to be placed in the HCPR Account "subject to an annual appropriation by the General Assembly to the Department of Public Welfare."[7] The

1. Act of March 20, 2002, P.L. 154, as amended, 40 P.S. §§ 1303.101–1115.

2. Section 712 of the MCARE Act, 40 P.S. § 1303.712(a).

3. Section 712 of the MCARE Act, 40 P.S. § 1303.712(d).

4. Originally enacted as Act of December 23, 2003, P.L. 237, formerly 62 P.S. §§ 443.7 and 1301–A, et seq., repealed by the Act of December 22, 2005, P.L. 458, and reenacted as an amendment to the MCARE Act, 40 P.S. § § 1303.1101–1115.

5. While the initial legislation only provided abatements for the calendar years 2003 and 2004, the General Assembly later extended the program through 2007.

6. Act of March 4, 1971, P.L. 6, as amended 72 P.S. § 8211 (Cigarette Tax Law), added by the

Act of December 23, 2003, P.L. 250. Section 1211 of the Cigarette Tax Law stated:

> There is established in the General Fund a special account to be known as the [HCPR] Account. Eighteen and fifty-two hundredths per cent of the proceeds of the tax imposed by section 1206 shall be deposited in the account. Funds in the account shall be subject to an annual appropriation and shall be administered as provided by law.
> 72 P.S. § 8211.

7. 40 P.S. § 1303.1112(a), repealed by Act of October 9, 2009, P.L. 537, No. 50, § 7(5). Section 1112(a) of the Abatement Law provides as follows:

> (a) Fund established. There is established within the General Fund a special account to be known as the [HCPR] Account.

Budget Secretary was given the authority to make transfers from the HCPR Account to the MCARE Fund and to determine the amount of such transfers up to a certain limit. Specifically, Section 1112(c) of the Abatement Law provides, "The Secretary of the Budget *may* annually transfer from the [HCPR] account to the [MCARE] Fund an amount up to the aggregate amount of abatements granted by the Insurance Department under section 1104(b)." 40 P.S. § 1303.1112(c). (Emphasis added).

The MCARE Fund is a special fund to pay claims against participating health care providers, including doctors, for losses or damages against them in excess of the basic insurance coverage that the MCARE Act requires them to purchase. Section 1303.712(a) of the MCARE Act, 40 P.S. § 1303.712(a). The MCARE Fund is:

funded by an assessment on each participating health care provider.... The assessment shall be based on the prevailing primary premium for each participating health care provider and shall, in the aggregate, produce an amount sufficient to do all of the following:

(i) Reimburse the fund for the payment of reported claims which became final during the preceding claims period.

(ii) Pay expenses of the fund incurred during the preceding claims period.

(iii) Pay principal and interest on moneys transferred into the fund in accordance with section 713(c).[8]

(iv) Provide a reserve that shall be 10% of the sum of subparagraphs (i), (ii) and (iii).

Section 1303.712 of the MCARE Act, 40 P.S. § 1303.712(a). In 2002, before the HCPR Program went into affect, health care providers paid $348 Million in assessments. When the HCPR Program was extant, health care providers paid assessments of $200 Million in 2003, $212 Million in 2004, $216 million in 2005, $162 Million in 2006, and $120 Million in 2007. After the General Assembly ended the HCPR Program in 2007, health care provider assessments rose to $229 Million for 2008. Worth noting is that from 2002 to 2007, the MCARE Fund balance was between $11 and $59 Million, but in 2008, it rose to $104 Million. In that same period, claims paid for malpractice were $346 Million in 2002, $379 Million in 2003, $320 Million in 2004, $232 Million in 2005, $210 Million in 2006, $191 Million in 2007, and $174 Million in 2008.

Because the HCPR Program was repealed in 2007, all abatements to doctors have been paid, and it has been asserted that no further money is needed in the MCARE Fund to pay malpractice claims. Therefore, at the center of this case is what happens to the tax money that was previously in the HCPR Account. Specifically, does all money in that Account have to be transferred to the MCARE Fund even though that will result in the Fund being overfunded by hundreds of millions of dollars? The answer to that question is important because the Abatement Law

---

Funds in the account shall be subject to an annual appropriation by the General Assembly to [DPW]. [DPW] shall administer funds appropriated under this section consistent with its duties under section 201(1) of . . . the Public Welfare Code.

**8.** Section 713(c) provides that the "Governor may transfer to the fund from the Catastroph-

ic Loss Benefits Continuation Fund, or such other funds as may be appropriate, such money as is necessary in order to pay the liabilities of the fund until sufficient revenues are realized by the fund. Any transfer made under this subsection shall be repaid with interest. . . ."

provides that any excess monies in the MCARE Fund upon termination of the program is to be given back to the doctors even though doctors had received all the abatement that they were entitled to receive under the HCPR Program and there are sufficient funds to pay malpractice claims. Section 1303.712(k) provides as follows:

> (k) Termination.—Upon satisfaction of all liabilities of the fund, the fund shall terminate. Any balance remaining in the fund upon such termination shall be returned by the department to the participating health care providers who participated in the fund in proportion to their assessments in the preceding calendar year.

40 P.S. § 1303.712(k).

## II.

It is undisputed that from 2003 to 2007, a total of $731,517,112 was deposited into the HCPR Account and during that time-frame, the Commonwealth granted $946 million in abatements to health care providers. In 2004 and 2005, Executive Branch Agencies transferred approximately $330 million from the HCPR Account to the MCARE Fund that had the net effect of paying loans previously made by the Motor Vehicle Fund to the MCARE Fund.[9] In addition, approximately $170 million in motor vehicle surcharge revenue was deposited into the MCARE Fund from 2004 to 2007. No funds were transferred from the HCPR Account to the MCARE Fund after 2005 even though abatements continued to be awarded through 2007.

Despite this lack of transfers, it is also undisputed that as of December 31, 2008, after all expenses and obligations were paid for that year, the MCARE Fund still had a balance of over $104 million. According to Peter J. Adams (Commissioner Adams), the Pennsylvania Insurance Department's Deputy Insurance Commissioner for MCARE, the MCARE Fund has continually been able to fulfill its obligations to pay claims and expenses since its inception in 2002. Commissioner Adams also averred that "[e]ven after the transfer of $100 million to the General Fund, the MCARE Fund will have sufficient funds to fulfill its current obligations to pay claims and expenses."

Despite this apparent overfunding and lack of any need for the funds to give doctors abatements for their medical malpractice claims, the Petitioners (collectively, "Medical Society") sought to have somewhere between $446 million and $616 million transferred from the HCPR Account to the MCARE Fund. To do so, the Medical Society filed a petition for review alleging Respondents (collectively, "Executive Branch Agencies") were required under the Abatement Law to transfer funds from the HCPR Account into the MCARE Fund in an amount equal to the abatements granted and that Executive Branch Agencies had failed to do so. The Medical Society requested declaratory judgment regarding Executive Branch Agencies' statutory duties under the Abatement Law, a writ of mandamus directing transfer of funds from the HCPR Account into the MCARE Fund in the amount needed

9. In 2003, the Motor License Fund was the source of a $220 Million loan to the Fund to pay liabilities. In 2004, the Motor License Fund provided another $207 Million loan and the first transfer of $100M was transferred into the MCARE Fund, but $225.4 Million was repaid to the Motor Vehicle Fund. In 2005, there was a transfer from the HCPR Account to the Fund of $230 Million. Again, the Motor Vehicle Fund received repayment of its loan of $214.6 Million. After 2006, there were no loans from the Motor Vehicle Fund or transfers from other accounts.

to fully fund the abatements, and an order directing the Executive Branch Agencies not to use or transfer the money in the HCPR Account for any other purpose. They also demanded an accounting and alleged that Executive Branch Agencies' administration of the HCPR Account violated the Uniformity Clause of the Pennsylvania Constitution because it shifted the burden of funding the MCARE abatements onto doctors and resulted in a non-uniform tax burden.[10] Executive Branch Agencies filed preliminary objections in the nature of a demurrer.

On July 24, 2009, this Court issued an unreported memorandum opinion agreeing with Executive Branch Agencies that because the abatements were not taxes the Uniformity Clause did not apply and Count II of the petition was, therefore, dismissed. All of Executive Branch Agencies' remaining preliminary objections were overruled and the case was scheduled for argument on Medical Society's application for summary relief regarding the issue of whether Executive Branch Agencies had the legal duty to use the HCPR Account funds to fully fund the abatements.

However, the underlying issue of whether the Executive Branch Agencies were statutorily required to transfer funds from the HCPR Account to the MCARE Fund was vitiated when the General Assembly relieved the Executive Branch Agencies of any obligation to do so. On October 9, 2009, before oral argument was even held on the matter before us, the General Assembly enacted the "Budget" [11] which abolished the HCPR Account and transferred the remaining $708 million from that account to the General Fund in order to help alleviate the Commonwealth's financial distress and reach a compromise to the budget impasse. In addition, $100 million was transferred from the MCARE Fund to the General Fund to be appropriated for other purposes. In doing so, the General Assembly implicitly made the legislative determination that those funds were no longer needed to provide subsidies to doctors. Notwithstanding the General Assembly's actions abolishing the HCPR Account and transferring all of the money at issue to the General Fund, the Medical Society did not amend its Petition for Review. It still alleges that it is entitled to the entire amount transferred out of these accounts and that approximately $808 million must be transferred to the MCARE Fund because the Medical Society has vested rights to these funds under the Abatement Law.

The gravamen of this case then is not whether doctors' subsidies will be paid because they all have been paid. It is not whether judgments against those doctors who committed malpractice will be paid, because they will be paid. Instead it is whether doctors in the Commonwealth are entitled to the $808 million in excess funds.

### III.

The majority, mainly relying on this Court's unreported opinion dismissing the preliminary objections, grants summary relief by agreeing with the Medical Society's claim that the Executive Branch Agencies still have a duty to make transfers of tax money from the HCPR Account, an account which no longer exists,

---

10. Given the Commonwealth's dire financial status during the summer of 2009, Medical Society were concerned the Governor and General Assembly would utilize funds in the HCPR Account to help alleviate the budget crisis. So they also filed applications for a preliminary injunction and a temporary restraining order, both of which were denied as premature.

11. Act of October 9, 2009, P.L. 537, No. 50, § 7(5).

to the MCARE Fund, which does not need the money. Even though the Abatement Law does not require that the Budget Secretary "shall" make such transfers, only that he *"may"* transfer tax money from the HCPR Account to the MCARE Fund, the Majority goes on to require that approximately $808 million be transferred to those accounts rather than to where the General Assembly directed it—the General Fund. The net effect of the Majority's holding is twofold: the 2009–2010 Pennsylvania Budget is out of balance, and the doctors of this Commonwealth are eligible to receive an $808,000,000 windfall from taxes imposed on ordinary citizens of the Commonwealth which is not needed to provide subsidies for the doctors' malpractice assessments.

## IV.

In arriving at its decision, the majority mainly relies on our previous July 24, 2009 decision overruling Executive Branch Agencies' preliminary objections which found that those agencies had an affirmative obligation to transfer funds from the HCPR Account to the MCARE Fund to fund abatements. In arriving at that conclusion, the majority mainly relies on the following portion of our previous opinion regarding preliminary objections where we stated, in pertinent part:

> Here, [the Commonwealth] rel[ies] on Section 1112(c) of the Abatement Law which states that 'the Secretary of the Budget *may* annually transfer from the account to the [MCARE] Fund an amount up to the aggregate amount of abatements granted by the Insurance Department under section 1104(b).' 40 P.S. § 1303.1112(c). (Emphasis added). The language of this section appears to give the Budget Secretary discretion to transfer funds from the HCPR Account to the MCARE Fund. However, as its

name suggests, the HCPR Program was established to retain health care providers in Pennsylvania by reducing the burden of paying professional liability insurance premiums under the MCARE program. The General Assembly established mandatory abatements, a mandatory account from which to fund the abatements and two mandatory funding sources for the abatements. (footnote omitted)

When Section 1112 is read in conjunction with the rest of the HCPR statute, including its title, and the description of the purpose and funding mechanisms for the HCPR program, to give the Budget Secretary complete unfettered discretion to decide whether to fund the MCARE Fund, regardless of the need for the funds, is obviously inconsistent with the statutory scheme. It certainly appears that the General Assembly has mandated that the HCPR Account pay for the abatements. As Petitioners point out, there is no provision for the [Insurance Department] to refuse to award abatements or decline to notify DPW when abatements are awarded. In addition, the General Assembly has taken measures to assure that the abatements are paid by the Fund, not providers. If a provider has already paid the assessment prior to the award of the abatement the General Assembly has directed in Section 1110 of the Abatement Law that "[t]he Insurance Department *shall* either issue refunds or credits for monies due health care providers under this chapter.["] (citation omitted)

*The Pennsylvania Med. Soc'y v. Dep't of Pub. Welfare* (Nos. 584, 585 M.D. 2008, filed July 24, 2009), slip op. at 13—14. Ignoring that this decision was based on law no longer extant, I disagree with the majority because it both misinterprets the effect of that decision—what, if any vested rights doctors have—and is based on the

misimpression that the payment of obligations is what is at issue in this case. For that reason and the following reasons, I disagree with the majority decision.

First, the doctors have already received all the benefits to which they claim they are entitled. In dismissing certain preliminary objections, all we held was that under the Abatement Law, sufficient transfers had to be made from the HCPR Account to the MCARE Fund to fund abatements, nothing more. Because the HCPR Program ended in 2007, abatements were only granted to subsidize doctors' malpractice assessments up to 2007, and they have long ago received those abatements. That part of the deal has already been completed, and doctors have received all of the abatements they are entitled to, vested or not.

Second, doctors do not have a vested right to receive hundreds of millions of dollars from tax money in the HCPR Account. The money that used to be in the Account is not needed because doctors have received all the abatements to which they were entitled. By directing the transfer of funds from the HCPR Account to the MCARE Fund, the majority will overfund the MCARE Fund by hundreds of millions of dollars which, under 40 P.S. § 1303.712(k), will then go to the doctors upon termination of the Fund. That is why in Section 1112(c) of the Abatement Law, the General Assembly only stated that the Budget Secretary "may," not must, transfer funds to the MCARE Fund. If the General Assembly wanted all designated tax funds transferred to the MCARE Fund, it would have just placed the taxes directly into that Fund. If doctors have any vested rights under the Abatement Law, it is to the abatements themselves, nothing more; they have no vested right in having those subsidies funded from any particular source.

Third, there are disputed facts. To the extent that there are insufficient funds to pay claims, Commissioner Adams has filed an affidavit stating that "[e]ven after the transfer of $100 million to the General Fund, the MCARE Fund will have sufficient funds to fulfill its current obligations to pay claims and expenses." Under Section 1303.71(c) of the MCARE Act, the doctors' cumulative assessment is statutorily fixed and will not change even if the transfer of the $800 Million taken to fund the 2009–2010 budget is ultimately deposited in the MCARE Fund. Given that those assessments are in excess of the current amount needed to cover all MCARE obligations, including the payout of malpractice claims, there appears to be sufficient funds to pay current obligations of the Fund. In any event, because this is a genuine issue of material fact, the application for summary relief must be denied for this reason alone. *Sherman v. Kaiser*, 664 A.2d 221, 225 (Pa.Cmwlth.1995).

Fourth, because they have not been harmed, doctors, and hence, the Medical Society have no standing to maintain this action. "In seeking judicial resolution of a controversy, a party must establish as a threshold matter that he has standing to maintain the action." *Stilp v. Commonwealth*, 596 Pa. 62, 940 A.2d 1227, 1233 (2007). As our Supreme Court explained in *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269, 280–81 (1975), (plurality), the core concept of standing is that a person who is not adversely affected in any way by the matter he seeks to challenge is not aggrieved thereby and has no standing to obtain a judicial resolution of his challenge. In this case, because the doctors have received all that they were entitled to receive and the amount of their statutory assessment is fixed no matter what, their

representative, the Medical Society, does not have standing to maintain this action.

Fifth, by ordering the Executive Branch Agencies to transfer funds from the HCPR Account to the MCARE Fund, the majority is ordering them to do something that is impossible for them to do. After the preliminary objections were decided, the General Assembly enacted the 2009–2010 Budget legislation which abolished the HCPR Account, directed that $100 million be taken from the MCARE Fund, and transferred all of those funds to the General Fund. The Secretaries of these Executive Branch Agencies have no authority to make a transfer from the General Fund to any other account without first having express authorization from the General Assembly to do so. Moreover, the State Treasurer would not allow such a transfer to take place.

Sixth, the General Assembly is an indispensable party to the lawsuit. A party is deemed indispensable "when his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights." *Vernon Township Water Auth. v. Vernon Township*, 734 A.2d 935, 938 n. 6 (Pa.Cmwlth. 1999). The General Assembly passed the Budget which transferred the funds from the HCPR Account and MCARE Fund to the General Fund. In effect, what the Medical Society is stating is that the 2009–2010 Budget legislation is unconstitutional. To enact the remedial legislation, authorizing legislation would be needed to appropriate the funds from the General Fund to the MCARE Fund. Here, the only entities named as Executive Branch Agencies were the Executive Branch Agencies, not the Commonwealth or the appropriate officials of the General Assembly needed to enact remedial legislation.[12] Because the failure to join an indispensable party to a lawsuit deprives the court of subject matter jurisdiction, *Pennsylvania Game Commission v. K.D. Miller Lumber Co., Inc.*, 654 A.2d 6, 9 (Pa.Cmwlth.1994); *O'Hare, III v. County of Northampton*, 782 A.2d 7, 13 (Pa.Cmwlth.2001), this action must be dismissed.

Finally, the matter is non-justiciable. The political question doctrine is considered to derive from the legal principle of separation of powers—the notion that the executive branch, the judiciary, and the legislature are co-equal, independent branches of government. *Pennsylvania School Boards Association, Inc. v. Commonwealth Association of School Administrators*, 569 Pa. 436, 805 A.2d 476 (1977) (citing *Sweeney v. Tucker*, 473 Pa. 493, 375 A.2d 698 (1977)). Certain functions and powers have been reserved to each of the branches by the constitution and the doctrine of separation of powers mandates that the judiciary not review those actions exclusively committed to another branch of government. *Harrisburg School District v. Hickok*, 762 A.2d 398 (Pa.Cmwlth.2000) (citing *Sweeney*, 473 Pa. at 508–09, 375 A.2d at 705–06). The courts must, therefore, determine whether judicial intervention is in fact warranted on an issue before the merits of a case can be heard. In *Sweeney*, the Supreme Court of Pennsylvania adopted the standard announced by the U.S. Supreme Court in the seminal case *Baker v. Carr*, 369 U.S. 186, 82 S.Ct.

---

**12.** See, e.g., *Pennsylvania State Association of County Commissioners, County of Allegheny, County of Bucks, County of Cumberland, County of Dauphin, County of Erie, County of Forest, County of Fulton, County of Monroe, County of Snyder, County of Tioga, Medical Society v. Commonwealth of Pennsylvania; Commonwealth of Pennsylvania, General Assembly; Mark S. Schweiker in his Official Capacity as President Pro–Tempore of the Pennsylvania Senate and Matthew J. Ryan in his Official Capacity as Speaker of the House of Representatives*, 545 Pa. 324, 681 A.2d 699 (1996).

691, 7 L.Ed.2d 663 (1962), for determining whether a case involves a non-justiciable political question:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

The case before this Court involves more than merely interpreting the laws of the Commonwealth and determining the constitutionality of legislative action. It requires us to appropriate money and dictate to the General Assembly how to budget, functions which have been constitutionally committed to the Executive and Legislative branches. Article VIII, Section 12 of the Pennsylvania Constitution mandates that every year the Governor shall submit a proposed, balanced operating budget to the General Assembly outlining in detail proposed expenditures and estimated revenues. If a deficiency exists, the Governor must also "recommend specific additional sources of revenue suffi-cient to pay the deficiency." Pa. Const. art. 8, § 12(a). It is then up to the General Assembly to make appropriations from the Commonwealth's revenues and surplus and to adopt a balanced budget. Pa. Const. art. 8, § 13.

The Governor and General Assembly were well within their constitutionally granted powers when they enacted the Budget legislation last October. The Commonwealth was facing an enormous financial crisis. In order to enact a budget and make up for our huge deficit, the General Assembly authorized the transfer of $708 million from the HCPR Account and $100 million from the MCARE Fund to the General Fund to be appropriated for other purposes. Even if the Commonwealth is somehow obligated to place more funds in the MCARE Fund, it is not for this court to direct that a particular tax be dedicated to fund some indefinite obligation; it is within the sole purview of the General Assembly to determine how that obligation will be satisfied. Judicial intervention in the legislative process is not warranted because it goes to the core question of the budgeting process making the enforcement of any order problematic.

Accordingly, for all of the foregoing reasons, I respectfully dissent.