39 A.3d 267

The PENNSYLVANIA MEDICAL SOCIETY, on behalf of itself and all of its Members, and Peter M. Daloni, M.D., Karen A. Rizzo, M.D. and Martin D. Trichtinger, M.D., Appellees

v.

The DEPARTMENT OF PUBLIC WELFARE OF the COMMONWEALTH of Pennsylvania and Office of the Budget of the Commonwealth of Pennsylvania, Appellants.

The Hospital and Healthsystem Association of Pennsylvania, Geisinger Health System, St. Vincent Health Center and Abington Memorial Hospital, Appellees

v.

The Department of Public Welfare of the Commonwealth of Pennsylvania, Office of the Budget of the Commonwealth of Pennsylvania, Appellants.

Supreme Court of Pennsylvania.

Argued Sept. 14, 2011.

Decided Feb. 29, 2012.

576

Jonathan F. Bloom, Thomas Walter Dymek, Karl Stewart Myers, Stradley, Ronon, Steven & Young, L.L.P., Philadelphia, for Amicus Curiae, the Senate of the Commonwealth of PA.

Philip H. Lebowitz, David Edwin Loder, Philadelphia, Nina L. Russakoff, Duane Morris, L.L.P., for Hospital & Healthsystem Assoc. of PA; Geisinger; St. Vincent; Abington Memorial Hospital.

Mark Alan Aronchick, Matthew Aaron Hamermesh, Daniel Segal, Dylan Joshua Steinberg, Philadelphia, Hangley Aronchick Segal & Pudlin, P.C., for Dept. of Public Welfare & Office of the Budget.

Barbara J. Holland, Office of General Counsel, Robert L. Pratter, PA Governor's Office of General Counsel, Mary Soderberg, for Office of the Budget.

Doris M. Leisch, Philadelphia, Allen C. Warshaw, Harrisburg, PA Department of Public Welfare, Estelle Richman, for Department of Public Welfare.

Tara Lynn Smith, PA House of Representatives, Nora Winkelman, for Appellant Amicus Curiae, Rep. Todd A. Eachus, Majority Leader of the PA House of Rep.

Kevin James McKeon, Scott Thomas Wyland, Harrisburg, Hawke McKeon & Sniscak, L.L.P., for PA Medical Society; Peter Daloni, M.D.; Karen Rizzo, M.D.; Martin Trichtinger, M.D.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice BAER.

The Department of Public Welfare ("DPW") and the Office of the Budget of the Commonwealth of Pennsylvania (collectively, the "Commonwealth") appeal from an order of the Commonwealth Court, which granted summary relief to Appellees, the Pennsylvania Medical Society and its individual members (collectively, "PAMS"), and the Hospital and Healthsystem Association of Pennsylvania and its individual members (collectively, "HAP"), *et al.* The court declared that the Commonwealth had an obligation under the Health Care Provider Retention Law ("the Abatement Law")[1] to transfer monies to the Medical Care Availability and Reduction of Error Fund ("MCARE Fund") in an amount necessary to fund, dollar for dollar, all abatements of annual assessments granted to health care providers for the years 2003–2007. For the reasons that follow, we reverse, and hold that the Abatement Law gave the Secretary of the Budget the discretion, but not the obligation, to transfer monies into the MCARE Fund in an amount up to the total amount of abatements granted.[2]

1. The Abatement Law was originally enacted as part of the Public Welfare Code at 62 P.S. §§ 443.7 and 1301–A–1310–A; repealed and reenacted in 2005 as an amendment to MCARE, 40 P.S. § 1303.1101–1115; and repealed in 2009. *See* Act of October 9, 2009, P.L. 537. Citations herein are made to the provisions of the Abatement Law as reenacted in the MCARE Act, subsequently repealed by the Act of October 9, 2009, P.L. 537.

2. Currently pending in our Court are consolidated actions also commenced by Appellees against some of the same Commonwealth parties involved herein. *Hosp. & Healthsystem Ass'n of Pennsylvania v. Commonwealth*, Nos. 20 and 21 MAP 2010. In those actions, the Commonwealth parties appealed the April 11, 2010 decision of the Commonwealth Court, *Hosp. & Healthsystem Ass'n of Pennsylvania v. Commonwealth*, 997 A.2d 392 (Pa.Cmwlth.2010) (*en banc*), which granted summary relief to Appellees by declaring that a transfer of $100 million from the MCARE Fund to the Commonwealth's General Fund impaired their vested rights. The appeals at Nos. 20 and 21 MAP 2010 have no bearing on the instant appeals, which involve a different statutory scheme, *i.e.*, the Abatement Law, and a different governmental account, the HCPR Account.

Because disposition of these appeals requires an understanding of the Medical Care Availability and Reduction of Error Act ("MCARE Act"), 40 P.S. § 1303.101 *et seq.*, and the Abatement Law, we begin with a brief review of the background of these statutes. The Legislature enacted the MCARE Act in response to perceived spiraling costs of medical malpractice claims, the resultant rise in health care providers' malpractice insurance premiums, and the alleged fear that qualified health care providers would choose not to practice medicine in the Commonwealth if the trend of escalating costs continued. *See* 40 P.S. § 1303.102(1) & (3) (providing that the purpose of the MCARE Act is to ensure that high quality health care is available in this Commonwealth and that medical professional liability insurance is obtainable at an affordable and reasonable cost); *Wexler v. Hecht*, 593 Pa. 118, 928 A.2d 973, 986 (2007) (Castille, J., dissenting) (stating that the "MCARE Act was a response to a widely publicized perceived health care crisis in Pennsylvania, which included an alleged fear on the part of medical practitioners that malpractice insurance was becoming unaffordable resulting in some medical doctors opting to leave practice in the Commonwealth.").[3]

The General Assembly enacted the MCARE Act in 2002, and created the MCARE Fund, which is a special fund in the Commonwealth's Treasury administered by the Pennsylvania Department of Insurance. The MCARE Fund provides a secondary layer of liability insurance coverage to health care providers by paying damages awarded in medical professional actions that exceed the minimum level of professional liability insurance the MCARE Act requires providers to maintain. 40 P.S. § 1303.712(a). In order to be licensed to practice medi-

---

3. This Court likewise responded to the perceived health care crisis in January of 2003, by adopting rules of civil procedure establishing stricter venue requirements for medical malpractice cases, and mandating the filing of a certificate of merit ("COM") from an appropriate licensed professional within sixty days of filing a professional malpractice action in the Commonwealth. *See* Pa.R.Civ.P. 1006(a.1), 1042.3; *see also Womer v. Hilliker*, 589 Pa. 256, 908 A.2d 269, 275 (2006) (stating that this Court exercised its rule-making authority in 2003 to devise an orderly procedure that would serve to identify and eliminate non-meritorious malpractice claims from the judicial system efficiently and promptly).

cine in Pennsylvania, health care providers must maintain both private professional liability insurance and contribute to the MCARE Fund.[4]

The MCARE Fund is primarily financed by mandatory annual assessments levied upon health care providers based on a statutory formula.[5] *Id.* § 1303.712(d). It is also funded by surcharges collected on motor vehicle violations, loans secured, when needed, from other sources of state funds, and investments. *Id.* §§ 1303.712(m), 1303.713(c), 1303.712(*l*). The MCARE Fund pays claims as they become due, projecting what monies will be needed for unresolved claims based on the statutory funding formula. *Id.* § 1303.712(d). If the statutory funding formula underestimates the required assessment revenue, the MCARE Fund must borrow money from other state funds. *Id.* § 1303.713(c).

If and when the Insurance Commissioner determines the private insurance market has the capacity to handle the professional liability requirements of health care providers, the MCARE Fund will, within a specified period from that determination, cease providing coverage and terminate. *Id.* §§ 1303.711(d)(3)-(4), 1303.712(c)(2). At that time, any money that remains in the MCARE Fund, once all liabilities are satisfied, will be distributed to those health care providers who contributed to the Fund in the year preceding the distribution. *Id.* § 1303.712(k). Due to the lag in filing and resolution of

4. Specifically, health care providers must obtain $500,000 per occurrence or claim of primary insurance coverage, *id.* § 1303.711(d)(2), and participate, via the payment of annual assessments, in the MCARE Fund, which provides an additional $500,000 per occurrence or claim of coverage above their primary insurance. *Id.* § 1303.712(c)(2)(i).

5. The statutory funding formula determines the aggregate annual assessments imposed on health care providers, estimated to be 110% of the Fund's claims and expenses from the prior year. *Id.* § 1303.712(d)(1). Current application of the statutory formula does not take into account any surplus in the MCARE Fund, although Appellees have unsuccessfully challenged such application in *In re: Appeal of the Hosp. & Healthsystem Assoc. of Pennsylvania v. MCARE*, No. MS 08–10–029, and *In Re: Appeal of the Pennsylvania Med. Soc'y v. MCARE*, No. MS 09–110–008, which appeals are currently pending before the Commonwealth Court. The propriety of the current application of the statutory formula for calculating annual MCARE assessments is not at issue in these appeals.

claims, MCARE payments and annual assessments will not cease when the MCARE Fund terminates. Rather, assessments of health care providers will continue until all MCARE liabilities have been paid. *Id.* § 1303.712(d) & (k).

In furtherance of its stated goal of retaining qualified health care providers in the Commonwealth, the General Assembly enacted the Abatement Law in 2003. The Abatement Law established the Health Care Provider Retention Program ("Abatement Program"), which, *inter alia*, served temporarily to abate (or reduce) the MCARE assessments paid by certain health care providers in the years 2003 to 2007. 40 P.S. § 1303.1102(a).[6] Under the Abatement Program, physicians in high-risk specialties were entitled to a 100% abatement of their annual MCARE assessment; all other physicians were entitled to an abatement of 50%. *Id.* § 1303.1104(b). The Abatement Law required health care providers who sought an abatement to continue to provide health care services in this Commonwealth for at least one year following the year for which the abatement was sought. *Id.* § 1303.1105(a). Any health care provider who ceased to provide such services during the relevant period was required to repay the full abatement amount, plus any costs. *Id.* § 1303.1105(b).

As part of the Abatement Program, the Legislature established a special account within the General Fund, known as the Health Care Provider Retention Account ("HCPR Account"). *Id.* § 1303.1112(a). Unlike the MCARE Fund, the HCPR Account was not funded by assessments from health care providers, but rather had two sources of public funding. First, the General Assembly increased the tax on cigarettes by 25 cents per pack via the 2003 Tax Reform Code Amendments,[7] and directed that a portion of the tax collected be

6. When originally enacted, the Abatement Law was limited to the 2003–2004 MCARE assessments. Subsequent legislation extended the Abatement Program to the 2005, 2006, and 2007 MCARE assessments. *See* Section 4 of the Act of November 29, 2004, P.L. 1272 (extending program to 2005); Section 2 of the Act of December 22, 2005, P.L. 458 (extending program to 2006); Section 2 of the Act of October 27, 2006, P.L. 1198, 40 P.S. § 1303.1102 (repealed) (extending program to 2007).

7. Act of March 4, 1971, P.L. 6, *as amended*, added by the Act of December 23, 2003, P.L. 250, 72 P.S. § 8211, subsequently repealed by Act of October 9, 2009, P.L. 537.

deposited directly into the HCPR Account. *Id.* Second, motor vehicle violation surcharge revenue was utilized to fund partially the Abatement Program. *See* Section 712(m) of the MCARE Act, 40 P.S. § 1303.712(m) (providing that motor vehicle violation surcharges collected under 75 Pa.C.S. § 6506(a) shall be deposited into the MCARE Fund to reduce health care provider surcharges and assessments); *see also* Section 1112(b) of the Abatement Law, 40 P.S. § 1303.1112(b) (authorizing the Secretary of the Budget to transfer annually into the HCPR Account those motor vehicle violation surcharge monies remaining in the MCARE Fund after discounts had been granted for that calendar year).

The Abatement Law designated DPW as administrator of the HCPR Account, and directed that the HCPR Account funds be subject to an annual appropriation by the General Assembly to DPW. *Id.* § 1303.1112(a). Section 1112(a) directed specifically that DPW "shall administer funds under this section consistent with its duties under section 201(1) of ... the Public Welfare Code," *id.* § 1303.1112(a), which relates to DPW's ability to seek matching federal funds for state programs. *See* 62 P.S. § 201(1) (providing that DPW shall have the power to "act as the sole agency of the State when applying for, receiving and using Federal funds for the financing in whole or in part of programs in fields in which the department has responsibility"). In accordance with Section 1112(a), the General Assembly, from 2004 through 2007, appropriated nearly $737 million for "health care provider retention." DPW, however, was unsuccessful in its attempt to obtain matching federal Medical Assistance funds for health care retention programs, and, at the end of each fiscal year, according to the Commonwealth, the unspent appropriations lapsed. *See* Brief of Appellants at 17.

Significantly, in 2004, the Legislature amended the Abatement Law to authorize the Budget Secretary to make transfers from the HCPR Account to the MCARE Fund, and to determine the amount of such transfers up to a specified limit. Section 1112(c) stated, "[t]he Secretary of the Budget may annually transfer from the [HCPR] account to the [MCARE]

Fund an amount up to the aggregate amount of abatements granted by the Insurance Department under Section 1104(b)." *Id.* § 1303.1112(c).

As explained in detail *infra*, the crux of Appellees' cause of action lies in its assertion that the Budget Secretary was required to transfer monies from the HCPR Account to the MCARE Fund in an amount equal to the total amount of abatements granted to health care providers during the relevant years, *i.e.*, that the Commonwealth should pay for all abatements of health care provider assessments from the HCPR Account. The record demonstrates that the amount of assessment abatements granted to health care providers substantially exceeded the amount of money transferred from the HCPR Account to the MCARE Fund.

To illustrate, from 2003 to 2007, health care providers were granted abatements from their assessments in the amount of $946 million. Despite having significant funds in the HCPR Account, the Budget Secretary transferred a total of only $330 million from the HCPR Account to the MCARE Fund in 2004 and 2005. Although abatements continued to be granted through 2007, and revenues continued to accumulate in the HCPR Account, the Budget Secretary made no more transfers to the MCARE Fund after 2005. It is important to note, however, that post–2005, the measures taken by the Legislature and the Judiciary to reduce medical malpractice claims proved to be effective, and MCARE claims began to decline. Accordingly, notwithstanding that the Budget Secretary made no further transfers from the HCPR Account to the MCARE Fund post–2005, the MCARE Fund contained sufficient monies to pay all MCARE claims, as well as permit all abatements guaranteed to health care providers by the Abatement Law to occur. Because funds continued to accumulate in the HCPR Account, but were not being transferred to the MCARE Fund, the HCPR Account had a balance exceeding $700 million as of July 31, 2009.

In 2009, the Commonwealth was confronted with a budget crisis. On October 9, 2009, the General Assembly enacted amendments to the Fiscal Code, which repealed the Abate-

ment Law, abolished the HCPR Account, and redirected the cigarette tax revenue that had been deposited in the HCPR Account to the General Fund. Act of October 9, 2009, P.L. 537, No. 50, § 7(5). In addition, this budget legislation substantially depleted the HCPR Account by transferring $708 million from the HCPR Account to the General Fund. 72 P.S. § 1717–K.

Prior to these events, in December 2008, Appellees, apparently recognizing that the Budget Secretary was no longer transferring monies from the HCPR Account to the MCARE Fund for the abatements, filed Petitions for Review in the Commonwealth Court's original jurisdiction against DPW and the Office of the Budget of the Commonwealth. In Counts I and II, the Petitions for Review sought a declaratory judgment that: (1) the Commonwealth violated the Abatement Law by not transferring sufficient funds from the HCPR Account to the MCARE Fund to reimburse fully the MCARE Fund for assessments granted (Count I); and (2) the Abatement Program, as implemented, having been essentially funded out of the MCARE Fund, constituted a program of unequal taxation in violation of the Uniformity Clause of the Pennsylvania Constitution because the refusal to fund the abatements shifted the costs of the Abatement Program from the general taxpayers to the subset of health care providers who paid MCARE assessments (Count II). In Count III, the Petitions for Review sought mandamus and/or injunctive relief in the form of an order directing the Commonwealth to transfer monies from the HCPR Account to the MCARE Fund up to the aggregate amount of the abatements.[8] On January 14, 2009, the actions were consolidated.

On January 12, 2009, the Commonwealth filed preliminary objections in the nature of a demurrer, asserting that the claims made in the Petitions for Review failed as a matter of law. It posited that the General Assembly did not link the HCPR Account directly to the Abatement Program, and,

8. Appellees did not specify the precise amount that must be transferred to the MCARE Fund and asserted that an accounting, as requested in Count III of the Petitions for Review, may be needed to determine that amount.

instead, made the Budget Secretary's authority to transfer monies from the HCPR Account to the MCARE Fund discretionary. The Commonwealth Court, sitting *en banc,* issued an unreported memorandum opinion (McGinley, J.) on July 24, 2009, sustaining the Commonwealth's preliminary objections in part and denying them in part. The court dismissed Count II in each of the Petitions for Review, concluding that the Abatement Law was enacted to alleviate the cost of medical professional liability insurance, and was not a tax subject to the Uniformity Clause's requirements. *See* PA. CONST. art. VIII, § 1; Cmwlth. Ct. Op., 7/24/09, at 17. With respect to Counts I and III, which concerned the Commonwealth's alleged duty to use the HCPR Account to fund fully the abatements of the assessments, the court held that such counts were legally sufficient to withstand demurrers. *Id.* at 11–14.

On September 9, 2009, Appellees filed a Joint Application for Summary Relief, referencing Counts I and III in the Petition for Review filed by PAMS. *See* Pa.R.A.P. 1532(b) ("At any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear."). On November 30, 2009, the Commonwealth filed "Respondents' Memorandum of Law in Opposition to Petitioners' Application for Summary Relief."

The Commonwealth Court granted Appellees summary relief. *Pennsylvania Med. Soc'y v. Dep't of Public Welfare,* 994 A.2d 33 (Pa.Cmwlth.2010) (*en banc* ). Initially, the court determined that there were no genuine issues of material fact that prevented the court from determining, as a matter of law, whether the Commonwealth had an obligation under the Abatement Law to reimburse the MCARE Fund for all abatements granted. Further, it noted that whether the Commonwealth fulfilled its alleged funding obligation was a question of undisputed fact that would not preclude the grant of summary relief.[9] Finally, the court found that Appellees' inability to

9. In conjunction with its determination that there were no issues of disputed fact, the court found that because the abatements were not

specify the exact amount that would be forthcoming from the Commonwealth if Appellees prevailed did not preclude a grant of summary relief, as the crux of the case involved a purely legal issue. *Id.* at 41 & n. 13.

The court also rejected the Commonwealth's contention that Appellees lacked standing to commence the instant actions. It determined that PAMS and HAP were associations that had standing to bring a cause of action on behalf of their individual members who alleged substantial, immediate, and direct injury resulting from the Commonwealth's failure to fulfill its alleged duty to fund all abatements granted in the relevant years. The court found it clear that the interests alleged to have adversely affected Appellees differed from the interests of the general citizenry. *Id.* at 41–42.

Regarding the merits of Appellees' contentions, and relying in large part on its previous opinion disposing of the Commonwealth's preliminary objections, the court concluded that the Abatement Law, when read in its entirety, required the Commonwealth to transfer monies from the HCPR Account to the MCARE Fund to pay, dollar for dollar, an amount equal to all health care provider assessment abatements. It acknowledged that Section 1112(a) of the Abatement Law employed the term "may" and, thus, appeared to give the Budget Secretary discretion concerning the transfer of funds from the HCPR Account to the MCARE Fund. 994 A.2d at 43. However, it relied upon the fact that the General Assembly established mandatory abatements, a mandatory account from which to fund the abatements, and mandatory funding sources

funded fully between 2003 and 2007, the MCARE Fund had less money available to meet its future obligations, which would result in increased future health care provider assessments. 994 A.2d at 40 n. 12. Specifically, the court stated, "[p]roviders in the future, therefore, will pay increased assessments, meaning that any abatements they have received were actually only mere payment deferrals, rather than abatements." *Id.* As noted *infra,* the Commonwealth strongly disputes this proposition by pointing out that the statutory formula for calculating health care provider assessments does not take into consideration the balance of the MCARE Fund. *See* 40 P.S. § 1303.712(d)(1) (providing that the statutory funding formula for calculating aggregate annual assessments imposed on providers is estimated to be 110% of the MCARE Fund's claims and expenses from the prior year).

for the abatements. The court reasoned that it would be inconsistent with this overall mandatory statutory scheme to give the Budget Secretary unfettered discretion to decide whether to fund assessment abatements.

Finally, the court discounted the Commonwealth's contention that the October 2009 budget legislation repealing the Abatement Law extinguished Appellees' right to relief. Citing Section 1976(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1976(a) (providing that "[t]he repeal of any civil provisions of a statute shall not affect or impair any act done, or right existing or accrued"), and the Remedies Clause of the Pennsylvania Constitution, PA. CONST. art. I, § 11 (prohibiting the enactment of retroactive legislation that extinguishes a vested right), the court held that the statutory rights of health care providers to the abatements were vested and could not be extinguished. *Pennsylvania Med. Soc'y*, 994 A.2d at 42–43. Quoting from its opinion disposing of the Commonwealth's preliminary objections, the court held:

> [T]he end of the HCPR Program only means that the Insurance Department will no longer grant abatements to eligible health care providers. It does not mean that DPW and Budget Secretary may avoid their statutory responsibilities to fund the program from the specifically designated HCPR Account while the program was in effect.

*Id.* at 44.

Judge Pellegrini filed a dissenting opinion. In his view, because all the abatements were provided and participating physicians received everything they were "promised" under the Abatement Law, the majority opinion gave Appellees an unwarranted personal windfall, with the consequential effect of rendering the 2009–2010 budget out of balance. *Id.* at 46. He opined that Section 1112(c) of the Abatement Law did not mandate transfers from the HCPR Account to the MCARE Fund or create vested rights to monies in the HCPR Account. Judge Pellegrini further asserted that the grant of summary relief was improper because: there were disputed facts in need of resolution, such as the effect of closing the HCPR Account on the MCARE Fund; the members of PAMS and

HAP had no injury that conferred standing; the Commonwealth parties were unable to comply with the majority's order to transfer funds absent express authorization from the General Assembly; the General Assembly was an indispensable party, which deprived the court of jurisdiction; and the entire matter was non-justiciable under the political question doctrine. *Id.* at 46–53.

■■■■ These direct appeals are now ready for disposition.[10] As the cases involve petitions for summary relief, we begin by acknowledging that an application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute. *Jubelirer v. Rendell*, 598 Pa. 16, 953 A.2d 514, 521 (2008); Pa.R.A.P. 1532(b).[11] Thus, in evaluating the Commonwealth Court's decision to grant summary relief, we examine whether there is any genuine issue of material fact and whether the moving party is entitled to relief as a matter of law. In doing so, we must "view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Murphy v. Duquesne Univ.*, 565 Pa. 571, 777 A.2d 418, 429 (2001). Where there is no dispute as to any material issues of fact, we must determine whether the lower court committed an error of law in granting summary relief. *Capek v. Devito*, 564 Pa. 267, 767 A.2d 1047, 1048, n. 1 (2001). As with all questions of law, our scope of review is plenary.

We begin by addressing the Commonwealth's contention that there are material facts in dispute precluding the grant of

10. We have jurisdiction over these appeals pursuant to Section 723(a) of the Judicial Code (providing that this Court has exclusive jurisdiction over appeals from final orders of the Commonwealth Court entered in any matter originally commenced in that court). 42 Pa.C.S. § 723(a).

11. The summary relief standard under this rule is similar to the summary judgment standard under the Pennsylvania Rules of Civil Procedure. *Brittain v. Beard*, 601 Pa. 409, 974 A.2d 479, 484 (2009) (citing Pa.R.A.P. 1532 (Official Note), which provides that subsection (b) of Pa.R.A.P. 1532 "authorizes immediate disposition of a petition for review, similar to the type of relief envisioned by the Pennsylvania Rules of Civil Procedure regarding judgment on the pleadings and peremptory and summary judgment.").

summary relief, and that it is entitled to additional discovery before there is a resolution on the merits. Particularly, the Commonwealth refers to the Commonwealth Court's finding that the alleged failure to make transfers from the MCARE Fund to the HCPR Account will cause health care providers to pay increased MCARE assessments in the future. It argues that it presented extensive evidence directly refuting this point. The Commonwealth further maintains that because the Commonwealth Court refused to allow it to conduct discovery, it had no chance to uncover admissions from Appellees to refute Appellees' evidence in this regard.[12]

In response, Appellees maintain that the Commonwealth Court correctly determined that there are no material issues of fact that preclude the grant of summary relief, and that no additional discovery was necessary to resolve the purely legal question of whether the Abatement Law required the Commonwealth to fund fully the abatements granted to health care providers. The Commonwealth's failure to fund the abatements, they submit, can be determined from the undisputed facts contained in the existing record. Contrary to the Commonwealth's contention, Appellees assert that the determination of whether future health care assessments will increase as a result of the Budget Secretary's failure to transfer additional monies to the MCARE Fund is not a question of fact, but rather is a legal conclusion based on statutory interpretation and undisputed facts.

We hold that there are no material issues of fact that preclude the grant of summary relief in favor of either party. Further, no additional discovery is necessary to resolve the purely legal question of whether the Abatement Law requires the Commonwealth to fund all assessment abatements granted

12. The Commonwealth also refers, without elaboration, to a list of 25 disputed material issues of fact, which it attached as Appendix A to its response to Appellees' motion for summary relief. *See* Brief of Appellants at 66 n. 43. We do not address each enumerated item on such list, as that is unnecessary for final disposition of Appellees' claims. Moreover, we note that this Court has declined to consider claims that a party fails to brief, but purports to incorporate by reference. *Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 10 n. 4 (2008).

to health care providers from funds contained in the HCPR Account. To resolve these appeals, we need only examine the statutory language of the Abatement Law and the undisputed facts regarding the amount of funds transferred and the amount of abatements granted.

Next, we turn to the Commonwealth's argument that Appellees lack standing to pursue the instant actions. We begin by reviewing the relevant law. This Court has held that "where a person is not adversely affected in any way by the matter challenged, he is not aggrieved and thus has no standing to obtain a judicial resolution of that challenge." *Hosp. & Healthsystem Ass'n of Pennsylvania v. Department of Public Welfare*, 585 Pa. 106, 888 A.2d 601, 607 (2005) (citing *William Penn Parking Garage, Inc., v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269, 280 (1975)). Moreover, in order to be aggrieved, a party must show that it has a substantial, direct and immediate interest in the claim sought to be litigated. *Id.; William Penn*, 346 A.2d at 280–83. We have defined these requirements as follows: a "substantial" interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law; a "direct" interest requires a showing that the matter complained of caused harm to the party's interest; an "immediate" interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it, and is shown where the interest the party seeks to protect is within the zone of interests sought to be protected by the statute or constitutional guarantee in question. *Hosp. & Healthsystem Ass'n*, 888 A.2d at 607; *South Whitehall Township Police Service v. South Whitehall Township*, 521 Pa. 82, 555 A.2d 793, 795 (1989). Additionally, an association, as a representative of its members, has standing to bring a cause of action even in the absence of injury to itself if the association alleges that at least one of its members is suffering immediate or threatened injury as a result of the challenged action and the members of the association have an interest in the litigation that is substantial, direct, and immediate. *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

According to the Commonwealth, Appellees have no interest at all in the HCPR Account because the Abatement Law does not provide for the distribution of funds to individual health care providers. The only provision granting health care providers the right to any distribution of funds, the Commonwealth asserts, is Section 712(k) of the MCARE Act, 40 P.S. § 1303.712(k), which provides that after all liabilities are satisfied, any balance remaining in the MCARE Fund shall be returned to those health care providers who participated in the MCARE Fund in the preceding year. The Commonwealth maintains that because of the lag time in the filing and disposition of claims, any distribution under Section 712(k) is decades away, and Appellees' interest therein is speculative, and not sufficiently imminent as to support standing.

Finally, the Commonwealth reiterates, the claim that the Budget Secretary's failure to fund all abatements will result in increased assessments in the future does not reflect an imminent or inevitable controversy. Transfers from the HCPR Account to the MCARE Fund will have no impact on future assessments, the Commonwealth maintains, because the statutory formula for calculating health care provider assessments does not take into consideration the balance of the MCARE fund. *See* 40 P.S. § 1303.712(d)(1) (providing that the statutory funding formula for calculating aggregate annual assessments imposed on providers is estimated to be 110% of the MCARE Fund's claims and expenses from the prior year). The Commonwealth quotes with approval Judge Pelligrini's dissenting opinion, which states "because the doctors have received all that they were entitled to receive and the amount of their statutory assessment is fixed no matter what, their representative ... does not have standing to maintain this action." *Pennsylvania Med. Soc'y v. Dep't of Public Welfare,* 994 A.2d at 51–52.[13]

Appellees respond that the Commonwealth Court correctly found that they had standing to maintain these actions be-

13. We agree with the Commonwealth's alternative argument that the court below misspoke in its standing analysis when it asserted that the individual physicians had standing because they received only 50% of

cause their interests, which were allegedly harmed by the Budget Secretary's failure to fund all MCARE abatements, were substantial, direct, and immediate. They emphasize that health care providers' interests in the proper administration of the Abatement Program differs from those of the general citizenry, that a causal connection existed between the Budget Secretary's failure to fund abatements and the alleged harm suffered, and that the harm was not too remote. According to Appellees, the failure to fund all abatements will result in increased health care provider assessments in the future, and such harm provides an alternative basis to confer standing.

We conclude that Appellees have standing to maintain the instant actions. As noted, the General Assembly specifically enacted the Abatement Law to reduce the MCARE assessments paid by health care providers in an effort to discourage them from leaving the Commonwealth due to the perceived rising costs of medical malpractice claims. Appellees, as health care providers and the associations representing them, have a direct interest in the litigation as they alleged harm in the form of increased future assessments arising from the Budget Secretary's failure to fund the abatements via transfers from the HCPR Account to the MCARE Fund. Further, Appellees' interest is immediate because there is a causal connection between the Budget Secretary's failure to fund all abatements granted and their alleged harm. Finally, we find that Appellees' interests are substantial as their interest in the outcome of the litigation clearly surpasses the common interest of the general citizenry. Accordingly, we conclude that Appellees have standing to pursue the instant actions.

■ We now proceed to the merits of the Commonwealth's appeal. The most fundamental of the Commonwealth Court's errors, it submits, was the court's misunderstanding of the

their abatements. *See Pa. Med. Soc'y v. Dep't of Pub. Welfare,* 994 A.2d at 41. The Commonwealth correctly notes that such fact does not confer standing as those particular individuals were only entitled to a 50% abatement under the statute. *See* 40 P.S. § 1303.1104(b)(2). This misstatement, however, does not affect our independent finding that Appellees have standing in these cases.

nature and purpose of the HCPR Account, as reflected in its holding that Section 1112 of the Abatement Law created the Account to provide a dollar-for-dollar transfer to the MCARE Fund for all abatements granted between 2003 and 2007. To the contrary, the Commonwealth maintains, the General Assembly permitted, but did not require, funds to be transferred from the HCPR Account to the MCARE Fund. The Commonwealth relies primarily on Section 1112(c), entitled "Transfers from [HCPR] account," which stated:

> The Secretary of the Budget *may* annually transfer from the [HCPR] account to the [MCARE] Fund an amount *up to* the aggregate amount of abatements granted by the Insurance Department under section 1104(b) [40 P.S. § 1303.1104].

40 P.S. § 1303.1112(c) (emphasis added).

According to the Commonwealth, this plain language demonstrates that transfers, if made at all, were within the Budget Secretary's discretion and did not need to equal the total amount of abatements granted. Rather, it asserts, the statutory language states expressly that the Budget Secretary may transfer monies to the MCARE Fund in an amount "up to the aggregate amount of abatements granted." *Id.* The Commonwealth contends that post–2005, no HCPR Account funds were necessary to replace the abated assessments as the MCARE Fund had sufficient resources to pay all MCARE claims. Considering the surplus in the MCARE Fund at the time, the Commonwealth maintains that the transfer of hundreds of millions of public tax dollars into the MCARE Fund would have amounted to an improper windfall for private health care providers.

In support of its position that the HCPR Account was not created solely to pay for abatements, the Commonwealth emphasizes that: the General Assembly did not deposit cigarette tax funds directly into the MCARE Fund, as it did with motor vehicle violation surcharges pursuant to 40 P.S. § 1303.712(m); the original enactment of the Abatement Law had no mechanism for transferring money from the HCPR Account to the MCARE Fund; the amount of the increase in

cigarette tax did not correspond to the amount required to pay for abatements; and funds continued to accumulate in the HCPR Account after the Abatement Program expired in 2007. The Commonwealth contends that HCPR Account funds were earmarked only to ensure that the MCARE Fund had sufficient annual assets to pay its outstanding liabilities, which it has done since 2005.

Further, the Commonwealth vigorously disputes the Commonwealth Court's finding that the failure to transfer money from the HCPR Account to the MCARE Fund will result in increased future health care provider assessments, and will jeopardize the MCARE Fund's ability to pay its claims. It reiterates that the MCARE Act's assessment formula is based on the amount of money actually paid in the previous year, the Fund's expenses, and its repayments of loans, *see* 40 P.S. § 1303.712(d)(1), and, thus, the balance in the MCARE Fund at any particular point in time has no impact on the assessments levied against health care providers.

The Commonwealth also challenges the Commonwealth Court's determination that Appellees have vested rights in HCPR Account monies, which survived the repeal of the Abatement Law. Additionally, the Commonwealth submits that the Commonwealth Court lacked jurisdiction under the political question doctrine, as these appeals concern issues of public policy relating to a crisis in the medical malpractice insurance industry and a crisis involving the state budget. They also argue that only the General Assembly has the authority to perform the acts necessary to afford Appellees the relief they seek, *i.e.*, the transfer of funds, and that a mandatory injunction and writ of mandamus are unavailable as remedies in this context. For all these reasons, the Commonwealth requests that we reverse the grant of summary relief.

In response, Appellees argue that the statutory language of the Abatement Law demonstrates that the Abatement Program, the HCPR Account, and the increase in the cigarette tax are all part of an integrated scheme to fund, dollar for dollar, the abatements granted to health care providers for the

pertinent years via transfers from the HCPR Account to the MCARE Fund.[14] The Commonwealth Court properly recognized, Appellees maintain, that the purpose of the Abatement Law was to reduce health care provider assessments by utilizing only tax monies collected specifically for that purpose, which were placed into an account designated appropriately as the Health Care Provider Retention Account.[15] According to Appellees, there is no language in the Abatement Act to support the Commonwealth's theory that the Legislature intended the Commonwealth to transfer HCPR Account monies to the MCARE Fund only when necessary to maintain the solvency of the Fund.

In support of their position, Appellees rely on those provisions of the Abatement Law which mandate the grant of abatements to eligible health care providers, 40 P.S. §§ 1303.1102, & 1303.1104(b), and create the HCPR Account. *Id.* § 1303.1112(a). They reiterate that the Legislature funded the HCPR Account via an increase in the cigarette tax. Appellees further rely on the following portion of Section 1112(a):

14. Appellees further rely on the legislative history of the Abatement Law, and cite comments from legislative debates, which suggest that the increase in cigarette tax revenue was earmarked to help physicians pay their medical malpractice premiums, a fact readily apparent from the plain language of the Abatement Law. The comments do not speak to whether the Commonwealth had a statutory obligation to fund the abatements in full. Appellees further rely on similar statements made by the Governor of Pennsylvania, DPW, and the MCARE Commission.

15. Appellees concede that the funding of abatements is not the "sole" purpose of the HCPR Account, and that any of the funds remaining in the HCPR account after abatements are paid in full can be used by the Legislature for another purpose. *See* Brief of Appellees at 34. They argue, however, that merely because the HCPR Account may have contained more funds than required to pay for abatements and continued to receive funding after the Abatement Program terminated does not undercut the Commonwealth's obligation to use the HCPR Account funds, in the first instance, for their primary purpose of funding abatements. Further, Appellees refute the Commonwealth's contention that had the Legislature intended for the cigarette tax increase to be used for abatements only, it would have deposited such funds directly into the MCARE Fund. Appellees maintain that the creation of a separate HCPR Account facilitated DPW's ability to seek matching federal funds for the Abatement Program.

Funds in the [HCPR] account shall be subject to an annual appropriation by the General Assembly to the Department of Public Welfare. The Department of Public Welfare shall administer funds appropriated under this section consistent with its duties under section 201(1) of the Act of June 13, 1967 (P.L. 31, No. 21) [62 P.S. § 201], known as the Public Welfare Code.

40 P.S. § 1303.1112(a). This language, they assert, which was part of the original enactment of the statute, provides the mechanism for transferring money from the HCPR Account to the MCARE Fund because it requires an "annual appropriation" and directs DPW to "administer" the funds, which Appellees interpret to mean "pay for abatements."[16] Thus, Appellees conclude that Section 1112(a) creates a duty requiring DPW to administer the funds by transferring them from the HCPR account to the MCARE Fund to pay for the entire amount of abatements granted.[17]

Appellees additionally refute the Commonwealth's reliance on Section 1112(c), which provides that the Budget Secretary "may" transfer from the HCPR account to the MCARE Fund "an amount up to the aggregate amount of abatements granted." 40 P.S. § 1303.1112(c). This language, Appellees contend, does not transform Section 1112(a)'s mandatory duty to fund fully abatements into a discretionary one, but rather permits the Budget Secretary to exercise discretion over the amount transferred to the MCARE Fund to avoid the overfunding of abatements. *See* Brief for Appellees at 38–39. They posit that the Commonwealth's reliance on the word "may" in Section 1112(c) "improperly attempts to balance the

16. Appellees assert that the Public Welfare Code commonly uses the terms "administer" or "administration" to describe DPW's responsibilities involving the expenditure of funds appropriated to DPW. *See* Brief for Appellees at 39–40.

17. The Commonwealth refutes Appellees' reliance on Section 1112(a), arguing that the term "administer" cannot reasonably be interpreted to mean "pay for abatements" when nothing in Section 1112(a) references abatements or the MCARE Fund. The Commonwealth further submits that Section 1112(a)'s reference to Section 201(1) of the Public Welfare Code does not involve abatements, but merely addresses DPW's power to act as the state agency when applying for matching federal funds.

interpretation of an entire program's structure on a single word in a single subsection, producing a result that conflicts with the rest of the HCPR statute, including its title, and its description of the purpose and funding mechanisms for the Abatement Program." Brief for Appellees at 36.

Appellees further note their agreement with the Commonwealth Court's holding that the failure to fund all abatements from HCPR Account monies will increase health care provider's future assessments and jeopardize the MCARE Fund's ability to pay claims. To finance the abatements from the MCARE Fund, which is financed primarily by the health care providers, is no abatement at all, Appellees submit, because it reduces the total balance in the MCARE Fund and thereby decreases the amount of funds available to pay future MCARE claims. According to Appellees, funding the abatements with MCARE Fund monies is actually an abatement deferral because "[e]very unfunded abatement dollar is a dollar that either a health care provider must pay now or in the future, or that providers will not receive when MCARE terminates operations." Brief for Appellees at 26. Thus, they maintain, "an abatement not funded is, for all practical purposes, an abatement not granted." *Id.*

Contrary to the Commonwealth's arguments, Appellees further argue that the 2009 budget legislation, which repealed the Abatement Law and abolished the HCPR Account, does not preclude them from obtaining a remedy addressing the Commonwealth's statutory violation pertaining to prior years. They argue that this Court's authority to determine that the Commonwealth abrogated a statutory duty, which impaired their vested right, is not dependent upon whether funds currently remain in the HCPR Account. Rather, Appellees suggest, the Commonwealth's obligation to fund the abatements vested when the abatements were awarded, and, therefore, cannot lapse or be impaired by subsequent legislation.

Additionally, Appellees contend that the Commonwealth cannot now take the position that it is unable to provide relief when, while litigating Appellees' request for a preliminary or special injunction, it assured the court that it would satisfy a

judgment if it did not prevail in the instant actions.[18] They also contend that the issue involving the political question doctrine is waived because the Commonwealth failed to brief its application below. Alternatively, Appellees argue that these appeals present issues of statutory interpretation of the Abatement Law, rather than non-justiciable political questions.

Finally, Appellees argue that the Uniformity Clause of the Pennsylvania Constitution provides an independent basis for a judgment in their favor. They assert that the refusal to fund all abatements from the HCPR Account, which consists of public monies, shifted the cost of the Abatement Program from the general public taxpayers to the subset of health care providers who paid MCARE assessments, thereby constituting a non-uniform, impermissible tax.[19]

Because these appeals are governed by interpretation of the relevant provisions of the Abatement Law, we begin with a review of the principles set forth in the Statutory Construction Act, 1 Pa.C.S. § 1501 *et seq.* The purpose of statutory construction is to ascertain and effectuate the intent of the General Assembly. 1 Pa.C.S. § 1921(a). The language employed by the General Assembly is the best indication of its intent. When the words of a statute are clear and free from all ambiguity, the letter of the law is not to be disregarded

18. On September 14, 2009, Appellees filed an application for special relief in the form of a preliminary injunction, as they were presumably concerned that on-going budget negotiations would result in the depletion of the HCPR Account. The Commonwealth Court denied the application on September 17, 2009. On October 13, 2009, Appellees filed an application for special relief in the form of a temporary restraining order in reaction to the transfer of monies in the HCPR Account to the General Fund. The Commonwealth Court denied the application on October 19, 2009.

19. The Senate of the Commonwealth of Pennsylvania and Representative Todd A. Eachus, Majority Leader of the House of Representatives, each submitted an *amicus curiae* brief in support of the Commonwealth, contending the political question doctrine precludes this Court from considering these cases and the Abatement Law did not create vested rights in HCPR Account monies. The American Medical Association submitted an *amicus curiae* brief in support of Appellees, asserting that participating health care providers have constitutionally-protected vested rights in HCPR Account monies.

under the pretext of pursuing its spirit. 1 Pa.C.S. § 1921(b). "In this regard, 'it is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include.'" *Piper Group, Inc. v. Bedminster Twp. Bd. of Supervisors,* 612 Pa. 282, 30 A.3d 1083, 1092 (2011) (citing *Commonwealth v. Rieck Investment Corp.,* 419 Pa. 52, 213 A.2d 277, 282 (1965)). Thus, as a matter of statutory construction, one must listen attentively both to what a statute says, and to what it does not say. *Piper Group, Inc.,* at 1092. Finally, it may be presumed that the General Assembly intends an entire statute to be effective and certain and does not intend a result that is absurd, impossible of execution or unreasonable. 1 Pa.C.S. § 1922(1).

With these guidelines in mind, we examine those provisions of the Abatement Law which, according to Appellees, required the Commonwealth to transfer funds from the HCPR Account to the MCARE Fund in an amount equal to the entire amount of abatements granted to health care providers. We consider first the provisions addressing the purpose of the legislation and the mandatory nature of the abatements. It is readily apparent, based on the plain language of the statute, that the Abatement Program was created to alleviate the health care providers' burden of paying MCARE assessments for a temporary period of time by granting abatements of assessments to all eligible providers. *See* 40 P.S. § 1303.1102(a) (establishing the Health Care Provider Retention Program, which "shall provide assistance in the form of assessment abatement to health care providers for calendar years 2003, 2004, 2005, 2006, and 2007"); *see also* 40 P.S. § 1303.1104(b) (providing that the "Insurance Department shall review the applicant's information and grant the applicable abatement of the assessment for the previous calendar year" based on enumerated criteria). These provisions, however, require only that abatements be granted to all eligible health care providers, which indisputably occurred here. They shed little, if any, light on whether the Commonwealth was required to transfer monies from the HCPR Account to the MCARE Fund under circumstances where the MCARE Fund had sufficient resources to

pay all claims. Stated differently, Appellees, as well as the Commonwealth Court below, conflate the mandatory nature of the grant of abatements and the Commonwealth's purported obligation to transfer monies to the MCARE Fund. Contrary to Appellees' contentions, Sections 1102(a) and 1104(b) of the Abatement Law speak exclusively to the former, and do not address the latter.

Similarly, we find minimal significance in the General Assembly's creation of a special account within the General Fund, designated as the Health Care Provider Retention Account, *id.* § 1303.1112(a), and its funding of such account via an increase in the cigarette tax pursuant to the 2003 Tax Reform Code Amendments. While this implicitly suggests that the Legislature intended for some HCPR Account monies to be utilized to pay for abatements, which, in turn, served to retain health care providers in the Commonwealth, it does not demonstrate, as Appellees submit, that the Commonwealth had an obligation to transfer funds from the HCPR Account to the MCARE Fund in an amount equal to all abatements granted. We reiterate that the Budget Secretary transferred $330 million from the HCPR account to the MCARE Fund to pay for abatements. What is at issue here is whether the Commonwealth was required to transfer an amount that would cover the entire $946 million granted in abatements. Thus, the mere creation of the HCPR Account does not resolve the instant dispute.

We also find no support in the remaining language of Section 1112(a) for Appellees' position that the Commonwealth had an obligation to transfer additional monies from the HCPR Account to the MCARE Fund to pay for all abatements. As noted, the particular statutory language relied upon by Appellees states:

Funds in the [HCPR] account shall be subject to an annual appropriation by the General Assembly to the Department of Public Welfare. The Department of Public Welfare shall administer funds appropriated under this section consistent with its duties under section 201(1) of the Act of June 13,

1967 (P.L. 31, No. 21) [62 P.S. § 201], known as the Public Welfare Code.

40 P.S. § 1303.1112(a).

Appellees allege that this language, which was part of the original enactment of the Abatement Law, requires an annual appropriation, and directs DPW to "administer" the HCPR Account funds. They interpret the word "administer," to mean "pay for all abatements." This interpretation is strained and unsupported by the plain and unambiguous statutory language. The term "administer" must be read in conjunction with the phrase that modifies it. Specifically, Section 1112(a) directs DPW to "administer" HCPR Account funds "consistent with its duties under section 201(1) of the Act of June 13, 1967 (P.L. 31, No. 21) [62 P.S. § 201], known as the Public Welfare Code." 40 P.S. § 1303.1112(a). Section 201 of the Public Welfare Code has nothing to do with abatements or transfers of money to the MCARE Fund, but rather grants DPW the power to "act as the sole agency of the State when applying for, receiving and using Federal funds for the financing in whole or in part of programs in fields in which the department has responsibility." 62 P.S. § 201(1).

Accordingly, we conclude that none of the provisions of the Abatement Law cited by Appellees or the Commonwealth Court below, when considered individually or in the aggregate, required the Commonwealth to transfer HCPR Account monies to the MCARE Fund in an amount necessary to fund all abatements granted. In fact, as the Commonwealth cogently argues, the only provision of the Abatement Law that contemplates transfers of monies from the HCPR Account to the MCARE Fund is Section 1112(c), which we find dispositive of these appeals.

In Section 1112(c), entitled "Transfers from [the HCPR] account," the General Assembly spoke definitively on the issue and gave the Budget Secretary discretion over the amount of monies to be transferred to the MCARE Fund. Section 1112(c) states:

The Secretary of the Budget may annually transfer from the [HCPR] account to the Medical Care Availability and Reduction of Error (MCARE) Fund an amount up to the aggregate amount of abatements granted by the Insurance Department under section 1104(b) [setting forth eligibility criteria for abatements].

40 P.S. § 1303.1112(c).

The plain language of this provision demonstrates that the Budget Secretary "may" transfer HCPR Account monies to the MCARE Fund in an amount "up to" the aggregate amount of abatements granted. To adopt Appellees' position would require this Court to ignore the discretionary nature of the grant of authority to the Budget Secretary, and the express language permitting the Budget Secretary to determine the amount of such transfers up to a specified limit. *See* 1 Pa.C.S. § 1921(a) (providing that "[e]very statute shall be construed, if possible, to give effect to all its provisions."). It bears repeating that the Budget Secretary exercised its discretion by transferring a total of $330 million from the HCPR Account to the MCARE Fund in 2004 and 2005. After 2005, when the MCARE Fund had sufficient resources to pay for MCARE claims, the Budget Secretary exercised its statutory discretion by declining to transfer additional funds. Simply put, such action did not violate the Abatement Law.[20]

█ Having concluded that Appellees have no statutory entitlement to the funds held in the HCPR Account, we likewise conclude that the Commonwealth Court erred by holding that Appellees had a vested right to such funds. *See*

**20.** Whether health care provider assessments could potentially increase in the future as a result of the Budget Secretary's failure to transfer additional monies to the MCARE Fund is not germane to our disposition, as the plain language of the controlling legislation governs. Further, a determination of whether future assessments may increase is beyond the scope of this appeal, as it involves an examination of the current application of the MCARE assessment formula set forth in the MCARE Act, 40 P.S. § 1303.712, which Appellees have challenged in separate appeals currently pending before the Commonwealth Court. *See In re: Appeal of the Hosp. & Healthsystem Ass'n of Pennsylvania v. MCARE*, No. MS 08–10–029, and *In Re: Appeal of the Pennsylvania Medical Society v. MCARE*, No. MS 09–110–008.

*Ieropoli v. AC&S Corp.*, 577 Pa. 138, 842 A.2d 919, 932 (2004) (providing that under the Remedies Clause of Article I, Section 11 of the Pennsylvania Constitution, an accrued cause of action is a vested right and, as such, cannot be eliminated by subsequent legislation). As we have held that the Abatement Law imposed no duty on the Commonwealth to transfer additional monies from the HCPR Account to the MCARE Fund, Appellees had not accrued any cause of action in relation thereto. Accordingly, we reject Appellees' contention that the Commonwealth's "obligation" to make such transfers vested when the abatements were awarded, and cannot be impaired by subsequent legislation. Additionally, as we find in favor of the Commonwealth herein, we need not address its remaining challenges based on the political question doctrine and the ability of this Court to grant Appellees the relief requested in their Petitions for Review.

▇▇▇▇ The only issue remaining for disposition is Appellees' alternative argument that the Uniformity Clause of the Pennsylvania Constitution provides an independent basis for a judgment in their favor. They posit that the refusal to fund the abatements from the HCPR Account, which consists of public monies, shifted the costs of the Abatement Program from the general taxpayers to the subset of health care providers who paid MCARE assessments, thereby constituting a non-uniform, impermissible tax. This contention fails as there is no unequal tax burden placed on Appellees, or any tax at all, as the health care providers received what they were entitled to under the Abatement Law. Thus, there is no factual predicate for a Uniformity Clause challenge. *See Alliance Home of Carlisle v. Bd. of Assessment Appeals*, 591 Pa. 436, 919 A.2d 206, 214–15 (2007) (providing that the general rule of tax uniformity embodied in Article VIII, Section I of the Pennsylvania Constitution removes the power of the legislature to impose unequal burdens upon the people under the form of taxation).

Accordingly, for the aforementioned reasons, we reverse the order of the Commonwealth Court.

Chief Justice CASTILLE, Justices SAYLOR, EAKIN, McCAFFERY and ORIE MELVIN join this opinion.

Justice TODD files a concurring opinion.

Justice TODD, concurring.

I join the majority's reversal of the Commonwealth Court's order granting summary relief to Appellees. Indeed, I agree with the majority's determination that the Health Care Provider Retention Law gave the Budget Secretary discretionary authority with regard to the transfer of monies from the Health Care Provider Retention Account ("HCPR Account") to the Medical Care Availability and Reduction of Error Fund ("MCARE Fund"), and, thus, I too conclude that Appellees' vested rights theory has no foundation. *See* 40 P.S. § 1303.1112(c) (repealed). I also agree with the majority there is no factual predicate for Appellees' Uniformity Clause challenge.

I do not, however, agree with the majority that Appellees have standing to maintain these actions, as I conclude they failed to demonstrate they are aggrieved by the Commonwealth's decision not to transfer monies from the MCARE Fund in an amount sufficient to fully fund assessment abatements granted from 2003 to 2007. *See City of Philadelphia v. Commonwealth*, 575 Pa. 542, 559–60, 838 A.2d 566, 577 (2003) ("The [standing] doctrine's core conception [is] that a party who is not negatively affected by the matter he seeks to challenge is not aggrieved, and thus, has no right to obtain judicial resolution of his challenge."). As the Commonwealth demonstrates, the statutory formula for assessment calculation, as applied by Pennsylvania's Insurance Commissioner since the MCARE Fund's creation in 2002, does not take the Fund's balance into account. *See* 40 P.S. § 1303.712(d). Thus, Appellees' assertion of harm in the form of increased assessments they will have pay in the future, which the majority accepts, is not only premised on a mere allegation, but is, in fact, unsupportable, given the manner by which assessments are currently calculated and collected. Accord-

ingly, in my view, the Commonwealth Court's order could be reversed on the basis of standing alone.